**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case 14-81057 CIV-WPD**

IN RE OCWEN FINANCIAL CORPORATION
SECURITIES LITIGATION

# CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. NATURE OF THE ACTION .......... 1

III. JURISDICTION AND VENUE .......... 11

IV. PARTIES .......... 12

A. Lead Plaintiff .......... 12

B. Defendants .......... 12

C. Confidential Witnesses .......... 14

V. BACKGROUND .......... 15

A. Ocwen And The Erbey Companies .......... 15

B. Ocwen's Rapid Expansion Raises Concerns From Regulators Prior To The Class Period .......... 18

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 28

A. Defendants' Misrpresentations Regarding The Scalability And Compliance Capabilities Of Ocwen's Technology Systems .......... 28

B. Defendants' Misrepresentations Regarding Ocwen's Regulatory Compliance During The Class Period .......... 31

C. Defendants' Misrepresentations Regarding Its Internal Controls To Avoid Potential Conflicts Of Interest With Related Parties .......... 35

D. Defendants' False Assurances To Its Investors Regarding The Letter-Backdating Issue .......... 42

E. Defendants' Statements Concerning The Cost Effectiveness Of Ocwen's Servicing Platform Were Materially Misleading To Investors Given The Compliance Shortfalls That Were Not Accounted For In the Purported Cost Savings .......... 46

F. The Truth Regarding Defendants' Misconduct Is Gradually Revealed .......... 47

1. The NYDFS Places An Indefinite Hold On The Wells Fargo Transaction And Identifies Numerous Compliance-Related Concerns In Multiple Public Letters To The Company .......... 47

2. The NMS Monitor Publicly Identifies Material Deficiencies In Ocwen's IRG And Severe Flaws In The Company's REALServicing Platform .......... 52

3. Defendant Erbey Resigns As Ocwen Belatedly Reveals The True Extent Of Its Compliance Deficiencies .......... 55

G. Post-Class Period Events .......... 58

VII. DEFENDANTS' SCIENTER WITH RESPECT TO THE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD....................... 59

A. Ocwen Has Agreed To Findings And Penalties By The New York Department Of Financial Services For Pervasive Non-Compliance During The Class Period........................................................................... 59

1. Ocwen's Employees Repeatedly Reported To Ocwen's Senior Compliance Officers The Deficiencies In Ocwen's Servicing Platform ........................................................................ 62

2. Ocwen's Senior Managers Knew That The Backdating Of Loan Modification Letters Was A Problem As Early As November 2013.......................................................................... 68

3. The Dual Roles of Employees At Ocwen And Altisource Violated Regulatory Requirements........................................................ 70

B. Ocwen Knew Or Recklessly Disregarded That Its Public Statements Concerning Controls Over Related Party Transactions Were False And Misleading.............................................................................. 71

1. Ocwen's Lack Of Controls Over Related-Party Transactions Exacerbated Its Severe Compliance Deficiencies.................................... 71

2. Ocwen Knowingly And Recklessly Misled Investors About Its Related Party Policies ........................................................... 74

C. Direct Evidence Of Defendant Erbey's Scientier ................................................ 77

D. Defendant Erbey's Financial Motivation To Conceal Facts From Investors ......................................................................................... 80

E. Defendant Erbey's And Defendant Faris's Positions Within Ocwen And The Erbey Companies Raise A Strong Inference Of Their Scienter.......................................................................................... 82

F. The Magnitude Of The Backdating Scandal....................................................... 85

VIII. LOSS CAUSATION...................................................................................................... 85

IX. THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES........................................... 94

X. THE STATUTORY SAFE HARBOR IS INAPPLICABLE........................................... 95

XI. CLASS ACTION ALLEGATIONS ................................................................................ 95

XII. CAUSES OF ACTION .................................................................................................... 97

JURY DEMAND ........................................................................................................................ 103

## I. INTRODUCTION

Lead Plaintiff Sjunde AP-Fonden ("Lead Plaintiff" or "AP7") makes the following allegations against defendants Ocwen Financial Corporation ("Ocwen" or the "Company"), William C. Erbey ("Erbey") and Ronald M. Faris ("Faris") (collectively, "Defendants").[1] Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's counsel, the allegations herein are based upon an investigation undertaken by Lead Plaintiff's counsel, which included, but was not limited to, the review and analysis of: (i) Ocwen's public filings with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about Ocwen; (iii) transcripts of Ocwen's conference calls; (iv) Ocwen press releases; (v) media reports concerning Ocwen, including online news sources; (vi) numerous interviews with former Ocwen employees; (vii) publications by regulatory agencies, including the New York Department of Financial Services and the Consumer Financial Protection Bureau; and (viii) public filings by entities related to Ocwen. Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## II. NATURE OF THE ACTION

1. This case arises from the Defendants' misrepresentations and omissions during the Class Period made to purchasers of Ocwen's common stock regarding Ocwen's purported compliance with servicing mandates and regulations imposed upon the Company by the New York Department of Financial Services ("NYDFS") and by regulators in connection with the National Mortgage Settlement ("NMS"). The investing public was well aware that Ocwen's compliance with these servicing mandates and regulations was a pre-condition to Ocwen's

---

[1] All emphasis is added unless otherwise noted.

continued acquisition of mortgage servicing rights ("MSRs"), which served as the principal basis for the Company's projected and actual revenue growth throughout the Class Period.

2. These servicing mandates and regulations governing Ocwen's operations existed prior to the commencement of the Class Period, as Ocwen had entered into consent orders and settlements in December 2011 and December 2012 with the NYDFS. As part of the NYDFS settlement, Ocwen also agreed to have an independant monitor installed at the Company (the "DFS Monitor"). In addition, Ocwen was subject to servicing guidelines imposed by the NMS starting in December 2013, through its acquisition of MSRs to loans previously owned by banks that were subject to the NMS.

3. Throughout the Class Period, Ocwen made numerous statements attesting to the fact that it complied with the NYDFS mandates, and was in a position to, and did, comply with NMS servicing guidelines and that said compliance actually set Ocwen apart from its peers. For example, Ocwen said during the Class Period:

- That its "**[s]calable and [c]ompliant servicing platform . . . enables us to operate in a compliant manner in an increasingly complex and highly regulated environment**."
- "We consider our solid balance sheet**, National Mortgage Settlement compliance and long history of success in large servicing transfers**, where we are able to substantially reduce delinquencies and keep more people in their homes, **to be substantital competitive advantages**."
- With respect to compliance with NMS Servicing guidelines: "Ocwen is not a party to these orders and settlements, but **Ocwen services or subservices loans for parties which are subject to these settlements and therefore services in compliance with those standards as applicable**."
- With respect to the ability of its servicing platform to accommodate the influx of new loans: "[T]he design of our systems and platform allow us to manufacture new capacity **more efficiently and effectively than other servicers**."
- With respect to its scalability and cost advantage: "Ocwen's cost to service non-performing loans is **70% lower than the industry average**."

4. These and other statements, detailed herein, assured purchasers of Ocwen stock that Ocwen was in compliance with applicable servicing guidelines, was poised for continued growth and was able to manage the large influx of mortgage servicing rights it was acquiring.

5. In reality, however, in stark contrast to their public statements and as known or recklessly disregarded by the Defendants as detailed below, Ocwen did not utilize a servicing platform during the Class Period that (i) was sufficiently scalable to accommodate the huge influx of MSRs it was acquiring; (ii) enabled Ocwen to operate in a compliant manner with the NYDFS and NMS servicing requirements; and (iii) offered a competitive advantage over its peers. As a result, Ocwen's undisclosed non-compliance and the substantial added costs necessary to ensure compliance undermined all of these claims.

6. A second category of material misstatements arose out of the regulatory scrutiny over Ocwen's unique entanglement of related parties through which Ocwen provided its servicing functions. While Ocwen's business was principally in the area of servicing mortgages, the platform which it historically had used to service its mortgages, called REALServicing, was owned and leased by Ocwen from Altisource Portfolio Solutions, S.A. ("Altisource"), a sister corporation of Ocwen also chaired by Defendant Erbey, which had been spun off from Ocwen in 2009 as a separate public company.

7. Altisource is one of a bevy of vertically integrated yet separate public companies, with interchangeable and shared employees, each of which Defendant Erbey acted as Chairman and owned a significant stake. As of December 31, 2013, Defendant Erbey owned 13% of Ocwen's shares and 26% of Altisource's outstanding shares.

8. The NYDFS and the investing public were both keenly attuned to the potential conflicts of interest resulting from Ocwen relationships with the Erbey related parties and the

dangers that such conflicts posed to homeowners. The consent orders that Ocwen entered into with the NYDFS and the NMS required Ocwen to provide market rates to homeowners for services provided by third party vendors and to monitor the services such third parties provided. To assure its regulators—and thus its investors—that Ocwen's contracts with the Erbey related parties did not adversely impact the homeowners whose mortgages it serviced, Ocwen made repeated public statements about its purported internal controls over related party transactions. For instance:

- Defendant Erbey told Ocwen's investors in a December 2013 Investor Conference: "One of the things that I like to stress again is that the strategic allies are not affiliates, that each company has its own separate Board of Directors, the majority of whom are independent, and we have robust related party transaction approval process[es]. ***Any related party transactions between the companies I actually recuse myself from that decision.***"

- Similarly, Ocwen said in its 2013 Form 10-K filed with the SEC on March 3, 2014 that: "We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, **including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transcactions with these entities**. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors."

- With respect to service agreements between Ocwen and the Erbey related companies, Ocwen promised: "We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: **the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers**."

9. Once again, however, these statements were false and misleading when made, as the Company failed to ensure that the related party transactions between Ocwen and the Erbey related companies adhered to these purported internal controls. In fact, in contrast to its public statements to investors, Ocwen did not even have a written policy governing related party transactions. The public statements suggesting that such related party policies not only existed,

but were followed during the Class Period when Ocwen entered into related party transactions, were knowingly or recklessly false when made, as it has since been disclosed that Defendant Erbey did not recuse himself from such transactions, and that Altisource charged above-market rates to Ocwen homeowners. In addition, because such internal controls were necessary to ensure that Ocwen was complying with the servicing mandates under which it was required to operate pursuant to the NYDFS consent order and settlement, as well as the NMS, these misrepresentations were also material to the investing public.

10. The truth began to emerge in connection with Ocwen's attempt to acquire $39 billion worth of MSRs from Wells Fargo in January 2014. The Wells Fargo transaction was an important deal for Ocwen because the overall amount of MSRs available from banks was finite and Wells Fargo's $39 billion deal represented almost 40% percent of the estimated MSRs available for sale over the near term. Indeed, Ocwen had publicly disclosed on November 5, 2013 in its quarterly report filed with the SEC on Form 10-Q for 3Q 2013 (the "3Q 2013 Form 10-Q") that "[w]e are currently aware of potential MSR acquisition opportunities with an aggregate UPB of approximately $400 billion over the next 12 to 18 months, with at least $100 billion in the next few months." As a result, the market recognized that without deals such as the announced Wells Fargo acquisition, Ocwen's growth would be severely curtailed. However, due to the misrepresentations regarding servicing compliance and related party transactions, the market was unaware of how grave a risk it was that Ocwen would be prevented by its regulators from participating in such future growth.

11. In this respect, on February 6, 2014, NYDFS Superintendent Benjamin Lawsky halted the massive Wells Fargo loan acquisition pending the Monitor's review of Ocwen's compliance, expressing "concerns about Ocwen's servicing portfolio growth." Three weeks

later, on February 26, 2014, Superintendent Lawsky wrote an open letter (the "February 26, 2014 Letter") disclosing his concerns about his discovery that S.P. Ravi, the Chief Risk Officer at Ocwen, was also the Chief Risk Officer at Altisource – a dual role that had not previously been disclosed to Ocwen's investors. For a Company that was required to have independent oversight over third parties that provided services to Ocwen's homeowners, sharing a Chief Risk Officer - to whom Ocwen's supposedly independent compliance group reported - with the primary third party providing such services was essentially having a fox in charge of the henhouse.

12. The following day, during the Company's conference call with analysts and investors to discuss its 4Q/FY 2013 financial results (the "February 27, 2014 Conference Call"), Defendant Erbey addressed Superintendent Lawsky's February 26, 2014 Letter, asserting that the Company's agreements with related parties were fully disclosed and on an arm's-length basis. Furthermore, in its 2013 Form 10-K, filed on March 3, 2014, Ocwen repeated that Defendant Erbey recused himself from all negotiations or approvals of related-party transactions and moreover, with respect to mortgage holders, any services that Ocwen's related parties provided to it were charged at "market rates." Relying on the Company's disclosures and reflecting their importance, analysts concurred that Ocwen had disclosed its related-party transactions and that Defendant Erbey recused himself from such decisions. For example, on February 26, 2014, analyst Piper Jaffray wrote: "Based on our knowledge, we believe OCN and its affiliates . . . disclose all contracts and relationships. These have been filed with the SEC. We believe these relationships are all above board and appropriate."

13. Yet, on April 21, 2014, Superintendent Lawsky issued another letter (the "April 21, 2014 Letter") exposing Ocwen's purported controls over related-party transactions as patently untrue. As set forth in the April 21, 2014 Letter, the Monitor had uncovered an

arrangement that subjected homeowners whose loans were serviced by Ocwen and foreclosed upon by Altisource to fees that were 30% to 300% higher than those Altisource charged to other institutions when the fees were the product of true arms-length negotiation. Ocwen and Altisource denied these claims.

14. In June 2014, Defendant Faris presented at an investor conference, during which he spoke optimistically about the approval of the Wells Fargo transaction and Ocwen's ability to compete for the pipeline of loans coming to market that year. As TheStreet.com reported on June 4, 2014, "Ocwen Shares Rise on Optimism Wells Fargo Deal will Proceed."

15. While Ocwen's inability to ensure compliance with the NMS and NYDFS requirements were still unknown to the market, information was revealed that undermined prior claims regarding the purported competitive advantages afforded by Ocwen's servicing platform. In this respect, on July 31, 2014, Ocwen surprised the market by revealing that, for the period ended June 30, 2014 ("2Q 2014"), increased compliance costs were having a devastating impact on the Company. In particular, Ocwen disclosed that regulatory costs had reached $12 million in the second quarter alone for New York State and national monitors, and it projected an additional $9 million for such costs in the next quarter, which were "a significant element of [Ocwen's] cost base." On this announcement, Ocwen's stock fell $4.49 per share, or 13% on heavy trading, eliminating more than $600 million in market capitalization. In response, analyst Piper Jaffray commented that same day, "[w]e believe more clarity on expense levels or resolution of regulatory issues are needed to drive shares higher."

16. While these disclosures began to reveal Ocwen's true costs of complying with the NMS and NYDFS regulations and the falsity of its prior claims about compliance, the truth about

Ocwen's ongoing violations of the NYDFS and NMS compliance mandates, and their impact on Ocwen's business, was yet to be revealed.

17. On August 4, 2014, the NYDFS disclosed in a letter (the "August 4, 2014 Letter") additional, previously undisclosed related-party transactions at Ocwen, wherein Ocwen was accused of kicking back $65 million in fees to Altisource for the placement of force-placed insurance on homeowners whose loans Ocwen was servicing. The transaction, detailed further herein, conflicted with the spirit and intent of the public statements made by Defendants regarding Ocwen's related party transaction practices, as the August 4, 2014 Letter revealed that the transaction had been approved by Defendant Erbey and was entered into after the NYDFS had raised its concerns in the February 26, 2014 Letter about Ocwen's related-party transactions. Moreover, as detailed further herein, it violated regulations prohibiting payments to related parties for force-placed insurance. Ocwen's share price fell 2.5% in response to this disclosure on heavy trading.

18. On October 21, 2014, the NYDFS, through its ongoing investigation of Ocwen's compliance, revealed in another open letter (the "October 21, 2014 Letter") that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of thousands" of borrowers in violation of the Company's legal and regulatory obligations. This was a devastating disclosure as the market now recognized that it would essentially end Ocwen's ability to grow through the purchase of more loans and permanently stall the Wells Fargo loan purchase. As the NYDFS declared: "The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law." Ocwen's share price collapsed with this disclosure, falling

$4.78 per share, or 18.2%, on extremely heavy trading, despite trading being halted briefly during the day.

19. In an effort to halt the slide in its stock price, Ocwen, issued a hasty and reckless press release before the market closed that same day (the "October 21, 2014 Press Release"). While admitting to the backdating problem, the Company asserted that the NYDFS's letter was overblown because the actual number of borrowers whose loans had been affected in New York State was limited to 283, and the issue had been completely resolved. After markets closed on October 21, 2014, however, Ocwen then revealed that the October 21, 2014 Press Release was inaccurate and accordingly retracted it, admitting that, in fact, the Company was unsure how many borrowers were impacted. On October 22, 2014, when Ocwen's shares resumed trading, their price fell a further 11.36%. Between October 21, 2014 and October 22, 2014, Ocwen's share price declined by $7.22, eradicating $908.35 million in shareholder value.

20. On this news, the Wells Fargo deal was widely pronounced as dead (along with Ocwen's ability to compete for other MSRs). On November 13, 2014, Ocwen and Wells Fargo mutually agreed to cancel the deal. However, while the investing public was aware of the fact that Ocwen's future growth prospects had been curtailed, the market still had no idea of the true extent of the compliance deficiencies that were plaguing the Company.

21. Finally, prior to the market opening on December 22, 2014, Ocwen announced that it had entered into yet another consent order with the NYDFS (the "December 22, 2014 Consent Order") (attached hereto as Ex. B). Despite previously denying any wrongdoing in response to the concerns raised by the NYDFS, Defendant Erbey, who was the architect of Ocwen's growth, shockingly agreed to resign from his positions as Executive Chairman of Ocwen, Altisource, and other related entities which provided services to Ocwen. In addition,

Ocwen **stipulated and agreed to** the following facts that directly contradicted its Class Period representations to its investors:

- There were severe deficiencies in its servicing platform, which was referred to as a "patchwork of legacy systems" that made it impossible to comply with its legal obligations during the Class Period;

- Defendant Erbey participated in the negotiation and approval of **"several transactions with the related parties,"** notwithstanding his claims that he recused himself from **all** related party transactions;

- Ocwen paid above-market rates to related-parties to the detriment of its homeowners; and

- A sampling of 478 loans reviewed by the NYDFS Monitor revealed ***1,358*** compliance violations, or approximately three violations per foreclosed loans.

22. The market was stunned by Ocwen's concessions in the Consent Order, with analysts noting that the Consent Order "went ***well beyond*** anything we were expecting" and would likely "cripple [Ocwen's] profitability for some time."

23. As the true extent of Ocwen's fraud was laid bare to the market on December 22, 2014, the Company's share price collapsed, falling by nearly ***27%*** and erasing an additional ***$740 million*** in market capitalization. In total, Ocwen's common share price declined by a staggering 63% between February 5, 2014 and December 22, 2014.

24. Superintendent Lawsky later noted on February 25, 2015 with respect to the fine levied on Ocwen and Defendant Erbey's forced resignation:

> [W]e continue to see fraud, after fraud, after fraud on Wall Street – since the individuals who engaged in the wrongdoing rarely, if ever, face any real consequences. . . . Of course, penalties imposed at the corporate level are often an important and necessary tool in our enforcement tool belt – particularly as it relates to organization-wide failures of oversight or compliance. . . . NYDFS . . . has taken a number of actions ***to expose and penalize misconduct by individual senior executives*** – including all the way up to the C-Suite, when appropriate. For example, NYDFS required . . . the Chairman of one of the United States' largest mortgage companies, Ocwen Financial, to step down as part of [its] enforcement action[] brought against [that] compan[y].

25. In addition, on October 5, 2015, the Securities and Exchange Commission published Release No. 76074 against Home Loan Servicing Solutions ("HLSS"), one of Erbey's related companies (the "SEC Release"). As set forth in the SEC Release, the SEC found that, in his capacity as Chairman of both Ocwen and HLSS and in contravention of his public statements to Ocwen investors, Erbey participated in approving several related-party transactions between the companies during the 2012-2014 time frame.

26. This federal securities class action is brought on behalf of all persons who purchased Ocwen common stock between May 2, 2013 and December 19, 2014, inclusive (the "Class Period"), and were damaged thereby (the "Class"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). Lead Plaintiff and the putative Class seek to recover their losses due to the Defendants' false statements and omissions during the Class Period regarding Ocwen's compliance with NYDFS and NMS regulations, the efficacy of its servicing platforms in connection with such compliance, and the nature of its controls to ensure its related party transactions did not violate regulatory requirements.

## III. JURISDICTION AND VENUE

27. Jurisdiction is conferred by § 27 of the Exchange Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act.

28. Venue is proper in the Southern District of Florida pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b). Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information,

occurred in this District. In addition, the Company is incorporated in the State of Florida and has substantial business operations in West Palm Beach, Florida.

29. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

30. Lead Plaintiff AP7 is part of the Swedish national pension system and is located in Stockholm, Sweden. AP7 manages approximately $31.18 billion in premium pension assets on behalf of more than 3 million Swedish pension savers. As reflected on the certification attached as Exhibit A hereto, AP7 purchased shares of Ocwen common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered losses as a result of the conduct complained of herein.

### B. Defendants

31. Defendant Ocwen is incorporated in Florida and headquartered in Atlanta, Georgia. It maintained during the Class Period executive offices in St. Croix, U.S.V.I. and West Palm Beach, Florida. The Company provides mortgage loan servicing and origination in the United States. Ocwen common stock is traded on the NYSE under the symbol "OCN."

32. Defendant Erbey served as the Executive Chairman of the Board of Directors of Ocwen during the Class Period. In addition, Defendant Erbey served as the Chairman of the Boards of Directors of Altisource, Altisource Residential Corporation ("RESI"), Altisource Asset Management Corporation ("AAMC"), and Home Loan Servicing Solutions ("HLSS").

33. Defendant Faris served as the President, Chief Executive Officer ("CEO"), and director of Ocwen at all relevant times.

34. Defendants Erbey and Faris are referred to collectively herein as the "Individual Defendants."

35. Defendant Ocwen and each of the Individual Defendants are liable for making the false and misleading statements that are alleged herein. In addition, each of the Individual Defendants, by reason of his status as a senior executive officer and/or director, and his day-to-day responsibilities over Ocwen, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ocwen's business and are liable for any false and misleading statements alleged herein attributable to Ocwen.

36. Specifically, because of their positions within the Company, the Individual Defendants controlled the contents of the Company's public statements made during the Class Period. The Individual Defendants were provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

37. Because of their positions and access to material non-public information, the Individual Defendants recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were materially false and misleading. As a result, the Individual Defendants are, and were, responsible for the accuracy of Ocwen's corporate statements and are therefore responsible and liable for the representations contained therein.

**C. Confidential Witnesses**

38. CW 1 was an employee of GMAC from 2008 until it was acquired by Ocwen. Following the acquisition, CW 1 worked as a Supervisor in Ocwen's Internal Review Group ("IRG"). The IRG was responsible for compliance of Ocwen's portfolio of loans acquired from a GMAC entity called Residential Capital ("ResCap"). CW 1 reported to IRG Vice President Ed Watson, who in turn reported to S.P. Ravi, Ocwen's (and Altisource's) Chief Risk Officer based in India. CW 1 continued in this role until March 2014. As a Supervisor, CW 1 was responsible for overseeing the transfer of ResCap loan data from the FiServ platform, ResCap's loan servicing platform, to REALServicing, the servicing platform used by Ocwen. In this role, CW 1 performed testing functions to ensure that the Company was complying with applicable regulations, and to document compliance-related issues with REALServicing. In performing these functions, CW 1 gained extensive firsthand experience with the REALServicing platform.

39. CW 2 was employed by GMAC from July 2008 until it was acquired by Ocwen. Following the acquisition and until CW 2's resignation in December 2013, CW 2 worked as a Supervisor in Ocwen's Default Timeline Management and Loss Mitigation Control group and reported to Vice President Gemma Camp. Camp, in turn, reported to Scott Anderson, Executive Vice President and Chief Servicing Offiver at Ocwen. CW 2 was responsible for ensuring that the foreclosure procedures being employed by Ocwen complied with the terms of the National Mortgage Settlement and CFPB regulations. In this role, CW 2 was directly responsible for tracking mortgages subject to loss mitigation proceedings, and for postponing foreclosure activities while such proceedings were pending. In performing these functions, CW 2 gained extensive, firsthand experience with both the FiServ and REALServicing platforms and, in particular, their capabilities with respect to ensuring compliance with the National Mortgage Settlement and CFPB regulations.

40. CW 3 was employed as a Relationship Manager in Ocwen's Home Retention Department from January 2012 until February 2014. CW 3 reported to Victoria Kubos, a Manager in the Home Retention Department. CW 3 assisted delinquent homeowners in getting their accounts current through, among other things, loan modifications. In this role, CW 3 communicated directly with homeowners whose loans were serviced by Ocwen, and also interacted regularly with Ocwen underwriters who were responsible for having loan modification letters mailed out to homeowners.

41. CW 4 was employed as a Senior Compliance Analyst at Ocwen's West Palm Beach, Florida office from January 2012 through September 2014. CW 4 reported to Ryan McIntyre, a Senior Manager of Loss Mitigation, who reported to Anna Demidova, Ocwen's Director of Loss Mitigation, Compliance Risk. CW 4 worked in Ocwen's Making Home Affordable ("MHA") compliance group, a unit which handled compliance for the Company's MHA program. This group was responsible for addressing compliance issues for approximately 20% of Ocwen's servicing portfolio. As a Senior Compliance Analyst, CW 4 met regularly with examiners from the U.S. Department of Treasury who were responsible for identifying compliance issues within Ocwen's MHA portfolio. CW 4 also has firsthand knowledge of the measures taken by the Company to address compliance issues identified by the Treasury as well as compliance issues identified internally by the Company. CW 4 also interacted with Ocwen's Correspondence Department, which was responsible for disseminating communications to homeowners.

## V. BACKGROUND

### A. Ocwen And The Erbey Companies

42. Founded by Defendant Erbey in 1988, Ocwen was the fourth-largest servicer of mortgages and the largest non-bank mortgage servicer in the United States during the Class

Period. Defendant Erbey was the Company's largest shareholder, owning approximately 13% of Ocwen's shares as of December 31, 2013. Together with a bevy of companies for which Defendant Erbey acted as Chairman and in which he owned a significant stake, Ocwen was the central operation in a vertical chain of Erbey-dominated companies involved in the loan origination, servicing, and foreclosure businesses.

43. Ocwen operated two primary lines of business during the Class Period – servicing and lending. Mortgage servicing, which accounted for the overwhelming majority of Ocwen's revenues and profits during the Class Period, involves the collection and remittance of principal and interest payments, the administration of escrow accounts, the collection of insurance claims, and the management of loans that are delinquent or in foreclosure. In particular, Ocwen specializes in servicing subprime and other high-risk non-prime mortgages. Thus, as part of its servicing operations, Ocwen often seeks to resolve loans in its portfolio that are considered non-performing or delinquent (i.e., the borrower has failed to make his or her scheduled payments) through, *inter alia*, loan modifications, discounted payoffs, deeds-in-lieu of foreclosure, and/or foreclosure.

44. Ocwen's servicing business earns revenue typically through fees as a percentage of the unpaid principal balance ("UPB") of the loans that it services. The UPB of Ocwen's servicing portfolio increases when the Company obtains rights to service portfolios of mortgage loans, or mortgage servicing rights ("MSRs"), and decreases when homeowners make normal principal payments on their mortgages. Because Ocwen's revenues are commensurate with the total UPB of its mortgage servicing portfolio, its acquisition of additional MSRs was criticial to its financial success during the Class Period.

45. Defendant Erbey not only served as the Executive Chairman of the Board of Directors of Ocwen but also served as Chairman of the Board of – and was a major shareholder in – four other mortgage-related businesses, which he created and spun off from Ocwen: Altisource, RESI, AAMC and HLSS (collectively, the "Erbey Companies"). Despite being separate public companies, the Erbey Companies continued to derive a material amount of their revenues and services through agreements with Ocwen following their separation, while Defendant Erbey personally benefited from his large stake in each of these related entities.

46. For example, in August 2009, Ocwen spun off its "Ocwen Solutions" business line into Altisource, a separate publicly traded company. From the date of its spin-off until the end of the Class Period, Defendant Erbey served as the Chairman of Altisource. As of December 31, 2013, Defendant Erbey owned or controlled 26% of Altisource's common stock and 873,508 options to purchase Altisource common stock.

47. Most of Altisource's revenues are derived from mortgage servicing technologies that it leases to Ocwen under long-term master services agreements. According to Altisource CEO Bill Shepro at Ocwen's December 2013 Conference, under these agreements, Altisource is "the provider of all the services that Ocwen would typically outsource" to third-party service providers.

48. In particular, Altisource provides its REALServicing platform to Ocwen, which Ocwen uses to assess whether resolving non-performing loans through modification, deed-in-lieu of foreclosure or foreclosure will optimize its net present value. When Ocwen determines, through REALServicing, to foreclose on a loan, Altisource then steps in to provide an array of foreclosure-related services, including asset management, insurance services, residential property valuation, default management services, and origination management services.

49. Altisource's asset management services include, among others, the operation of Hubzu, an online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure. A substantial portion of Ocwen's real estate owned and short-sale properties are marketed on Hubzu, and the vast majority of Hubzu listings are of Ocwen-serviced properties. Additionally, Ocwen uses a real estate agent employed by Altisource subsidiary REALHome Services and Solutions, Inc. to act as the seller's agent for many of its listings on Hubzu.

**B. Ocwen's Rapid Expansion Raises Concerns From Regulators Prior To The Class Period**

50. Following the 2008 financial crisis, large banking institutions became subject to increased regulatory demands aimed at curbing abusive mortgage servicing practices and heightened capital requirements in connection with their mortgage servicing portfolios. As a result, many began to divest their servicing portfolios. Because such capital requirements did not apply to non-bank servicers, Ocwen seized upon this opportunity by adding more than $400 billion in UPB to its MSR portfolio between 2010 and 2013.

51. Ocwen's common stock price increased commensurately. For example, in 2012, Ocwen nearly doubled the UPB of its residential servicing portfolio from $102.2 billion to $203.7 billion. During the same year, its total revenue increased by 70.4%, and its share price rose 139%, from $14.48 per share on December 30, 2011 to $34.59 per share on December 31, 2012. Commenting on Ocwen's explosive growth, the *Wall Street Journal* reported in an article published on December 7, 2012 that the Company had become a "stock-market darling" and "favorite among investors."

52. Meanwhile, however, Ocwen's frenetic growth began to draw increased scrutiny from the NYDFS, which, through its jurisdiction over licensed mortgage servicers in New York State, had the authority to delay and/or prevent Ocwen from acquiring additional MSRs.

53. Indeed, on August 24, 2011, Ocwen asked the NYDFS to approve its pending purchase of Litton Loan Servicing L.P. ("Litton") from Goldman Sachs – an acquisition that would increase Ocwen's servicing portfolio by over $38 billion, or more than 53% of the total UPB of Ocwen's servicing portfolio as of March 31, 2011. However, in a September 1, 2011 letter to Ocwen, the NYDFS expressed serious concerns about whether "the post-acquisition entity, which would become the twelfth largest mortgage servicer in the United States with a significant portfolio of stressed loans, would be able to effectively handle the increased servicing volume and comply with HAMP requirements, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities."

54. As a result, the NYDFS conditioned its issuance of a "No Objection" letter in connection with the Litton acquisition "upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to" the "2011 DFS Agreement," pursuant to which the NYDFS sought to ensure that Ocwen had "sufficient capacity to properly board and manage" its newly acquired loans.

55. Pursuant to the 2011 DFS Agreement, which was entered into on September 1, 2011 and amended on December 15, 2011, Ocwen was required to comply with the following mortgage servicing practices, among others:

a) "Servicer shall adopt policies and procedures to oversee and manage foreclosure firms, law firms, foreclosure trustees, and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) that provide foreclosure or bankruptcy processing services ('Third-Party Providers'), including", *inter alia*: (1) "[p]erforming due diligence of Third-Party Providers' qualifications, expertise, capacity, complaints, information systems, quality

assurance plans, financial viability, and compliance with licensing requirements and rules and regulations (including prohibitions on fee splitting)"; and (2) "[a]dopting standards for documentation of Third-Party Providers' fees and charges."

b) "Servicer shall develop and implement a program to maintain sufficient staff in place who are adequately trained to: (1) provide information to borrowers or borrowers' representatives; (2) process requests for loss mitigation alternatives, including loan modification applications; (3) evaluate requests for non-foreclosure options; (4) manage foreclosure documentation process, including execution of relevant foreclosure documents; (5) handle escalated cases; (6) facilitate resolution of borrower complaints; and (7) manage collections."

c) "Borrowers with pending modification requests must be provided with a notice within 5 days of the initial communication identifying the single point of contact. The notice shall provide: (1) a list of all documents and information required from the borrower to evaluate the borrower for a loan modification; (2) an explanation of any change in the type of loss mitigation alternative for which the borrower is being considered; (3) the reason for the change in the type of loss mitigation offered (*e.g.*, borrower does not qualify, program not offered); *(*4) the time frame in which the borrower must supply the requested information; (5) a toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of and Urban Development's website or the Division of Housing and Community Renewal's website; (6) a statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and (7) a statement outlining the action that will be taken if documentation is not received within the time period specified in the notice."

d) "Servicer shall perform or cause to be performed an independent review of each denial of a request for a loan modification. . . . If the independent review concludes that the loan modification denial was correct, Servicer shall promptly send a written non-approval notice to the borrower."

e) "Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, including for GSE loans to the extent consistent with FHFA guidelines for GSE loans."

f) "No mark-up shall be imposed on third-party default related foreclosure services. Referral fees shall not be paid to or accepted from third-party default or foreclosure related service providers, or in relations to third-party default or foreclosure services, regardless of whether such payment[s] are made direct[ly] or indirectly."

g) "To the extent Servicer purchases a master hazard insurance policy for force-placed insurance, it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred. In no event shall Servicer purchase a master hazard insurance policy from an affiliated entity."

h) "Servicer shall adhere to this Agreement for any loans acquired or otherwise added to Servicer's portfolio subsequent to the signing of this Agreement."

56. The 2011 DFS Agreement further stated that to the extent Ocwen "agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein with respect to such party."

57. In conditioning the Litton acquisition upon Ocwen's execution of the 2011 DFS Agreement, the NYDFS confirmed its authority (and willingness) to curb Ocwen's growth if it determined that Ocwen was not acting in the best interests of homeowners. Ocwen's continued growth throughout the Class Period was thus contingent upon its ability to comply with the rules and regulations imposed by the NYDFS.

58. In February 2012, shortly after Ocwen entered into the 2011 DFS Agreement, it was announced that the attorneys general of 49 states and the District of Columbia, the United States Department of Justice ("DOJ"), and the Department of Housing and Urban Development ("HUD") had entered into the National Settlement Agreement ("NMS") with the nation's five largest mortgage servicers at the time: Bank of America Corporation, J.P. Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and ResCap/GMAC.

59. The servicers subject to the NMS were required to provide $20 billion in consumer relief and $5 billion in additional payments. Additionally, the servicers agreed to adopt new servicing standards (the "NMS Servicing Standards"), which were designed to prevent past foreclosure abuses, such as "robo-signing," improper documentation, and lost

paperwork, and create new consumer protections. In particular, the NMS Servicing Standards, like the 2011 DFS Agreement, required the servicers to, among other things: (i) maintain strict oversight of foreclosure processing, including third-party vendors; (ii) make foreclosure a last resort by evaluating homeowners for other loss mitigation options first; (iii) place restrictions on foreclosing while the homeowner is being considered for a loan modification; (iv) implement procedures and timelines for reviewing loan modification applications and give homeowners the right to appeal denials; and (v) create a single point of contact for borrowers seeking information about their loans and maintain adequate staff to handle calls.

60. The NMS also established the role of an independent monitor, Joseph A. Smith Jr. (the "NMS Monitor"), to oversee the servicers' implementation of the NMS Servicing Standards. In this regard, the servicers agreed to file with the NMS Monitor regular reports detailing their compliance. Based upon his review of these reports, as well as his independent oversight, the NMS Monitor would then issue his own compliance reports on a semi-annual basis.

61. Commenting on the recently announced NMS during the Company's conference call with analysts and investors on February 23, 2012, Defendant Faris stated that the settlement "could provide business opportunity for Ocwen as requirements imposed on the banks play to our strengths in modifications, particularly principal reduction modifications, where we have been the industry leader." In addition, although Ocwen was not a party to the NMS, Defendant Faris assured that "[w]e have carefully analyzed all of the known requirements and [are] confident that we either already meet these standards or can readily do so. Even though the servicing requirements do not apply directly to Ocwen, it is our intention to treat them as de facto industry standards." Similarly, Defendant Faris represented during Ocwen's conference call with analysts and investors on May 3, 2012 that the NMS Servicing Standards "present

expansion opportunities as financial institutions will look to subservice more business to speciality servicers with scalable capacity and a demonstrated ability to meet compliance requirements." And again, during the Company's conference call with analysts and investors on August 2, 2012, Defendant Faris reaffirmed that "Ocwen has always viewed government settlements and agreements as de facto standards. But we have kept pace with the development by updating our systems and processes to adhere to these requirements."

62. On October 3, 2012, the Company announced that it had reached an agreement purchase Homeward's loan originating business and servicing platform from WL Ross & Co., LLC. In response to this announcement, Ocwen's share price increased over 20%, from a close of $28.96 on October 2, 2012 to close at $34.88 on October 3, 2012, while news and investment commentary touted the Homeward transaction as a reliable way for Ocwen to increase the UPB of its servicing portfolio. Less than a month later on October 24, 2012, Ocwen submitted a winning $3 billion bid on ResCap's loan servicing platform at a bankruptcy auction, which would usher in MSR assets totaling more than $370 billion in UPB pending the bankruptcy court's approval of the transaction on November 16, 2012. Analysts reporting on the ResCap deal, including Piper Jaffray, Compass Point, and Sterne Agee uniformly expected it to be accretive to Ocwen's future earnings.

63. The NYDFS did not share the market's enthusiasm over Ocwen's proposed acquisitions of Homeward and ResCap, however. Rather, on December 5, 2012, in view of Ocwen's "announced plans to further expand its servicing operations through the acquisition of additional mortgage servicing rights, including from Homeward . . . and . . . ResCap," the "concerns regarding Ocwen's rapid growth and capacity to properly board a significant portfolio of distressed home loans" underlying the 2011 DFS Agreement, and "preliminary evidence of

[Ocwen's] non-compliance" with the same, the NYDFS required Ocwen to install an "independent on-site monitor" – i.e. the DFS Monitor – tasked with conducting "a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures" pursuant to a Consent Order under New York Banking Law § 44 (the "2012 NYDFS Consent Order"). The 2012 NYDFS Consent Order further identified the following instances indicating Ocwen's non-compliance with the DFS Agreement:

> (1) failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification (referred to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen[.]

64. As part of the 2012 NYDFS Consent Order, Ocwen vowed to cooperate fully with the DFS Monitor and agreed that, in the event of Ocwen's breach of the 2012 NYDFS Consent Order, the NYDFS could pursue "all the remedies available under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuring hearings, notices, orders, and other remedies that may be available."

65. By entering into the 2012 NYDFS Consent Order, Ocwen was able to proceed with closing on its pending acquisitions of Homeward in December 2012 and ResCap in February 2013 as planned.

66. Because ResCap was a party to the NMS, Ocwen also became subject to the NMS with respect to the MSRs to approximately 1,600,000 mortgage loans that it had acquired from

ResCap. Accordingly, in connection with its ResCap portfolio, Ocwen agreed in February 2013 to comply with the NMS, subject to the review of the NMS Compliance Monitor, including the following NMS Servicing Standards, among others:

a) "Servicer shall adopt policies and processes to oversee and manage foreclosure firms, law firms, foreclosure trustees, subservicers and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by or on behalf of Servicer that provide foreclosure, bankruptcy or mortgage servicing activities (including loss mitigation) (collectively, such activities are 'Servicing Activities' and such providers are 'Third-Party Providers'), including[,]" *inter alia*: (1) "Servicer shall ensure that agreements, contracts or oversight policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures"; and (2) "Servicer shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability."

b) "Servicer shall be required to notify potentially eligible borrowers of currently available loss mitigation options prior to foreclosure referral. Upon the timely receipt of a complete loan modification application, Servicer shall evaluate borrowers for all eligible loan modification options for which they are eligible prior to referring a borrower to foreclosure and shall facilitate the submission and review of loss mitigation applications."

c) "Servicer shall notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation required for the loan modification to be considered complete."

d) "Servicer shall afford borrower 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination whether or not to grant an initial loan modification."

e) "Servicer shall maintain adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, and other Service operations. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate."

f) "Servicer shall maintain adequate staffing and caseload limits for SPOCs and employees responsible for handling foreclosure, loss mitigation and related communications with borrowers and housing counselors. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate."

g) "Servicer shall document electronically key actinos taken on a foreclosure, loan modification, bankruptcy, or other servicing file, including communications with the borrower."

h) "Servicer shall not adopt compensation arrangements for its employees that encourage foreclosure over loss mitigation alternatives."

i) "Servicer shall not impose unnecessary or duplicative property inspection, property preservation or valuation fees on the borrower."

j) "Servicer shall not collect any fee for default, foreclosure or bankruptcy-related servicers by an affiliate unless the amount of the fee does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, and (b) the market rate for the service. To determine the market rate, Servicer shall obtain annual market reviews of its affiliates' pricing for such default and foreclosure-related services; such market reviews shall be performed by a qualified, objective, independent third-party professional using procedures and standards generally accepted in the industry to yield accurate and reliable results. The independent third-party professional shall determine in its market survey the price actually charged by third-party affiliates and by independent third party vendors."

k) "Servicer shall not impose its own mark-ups on Servicer initiated third-party default or foreclosure-related services."

67. Also pursuant to the NMS, Ocwen agreed to implement the following Enforcement Terms, among others:

a) "Servicer will designate an internal quality control group that is independent from the line of business whose performance is being measured (the 'Internal Review Group') to perform compliance reviews . . . . For the purposes of this provision, a group that is independent from the line of business shall be one that does not perform operational work on mortgage servicing, and ultimately reports to a Chief Risk Officer, Chief Audit Executive, Chief Compliance Officer, or another employee or manager who has no direct operational responsibility . . . ."

b) "The Internal Review Group shall have the appropriate authority, privileges, and knowledge to effectively implement and conduct the reviews and metric assessments contemplated herein and under the terms and conditions of the Work Plan."

c) "The Internal Review Group shall have personnel skilled at evaluating and validating processes, decisions, and documentation utilized through the implementation of the Servicing Standards."

68. On December 19, 2013, the Consumer Financial Protection Bureau ("CFPB"), along with the attorneys general of 49 states, concluded a long-standing investigation into Ocwen's pre-Class Period loan servicing practices between 2009 and 2012, as well as the practices of Litton and Homeward prior to their acquisition by Ocwen in 2011 and 2012, respectively. The investigation culminated in a settlement (the "CFPB Consent Judgment") and simultaneous filing of a complaint alleging that during the pre-Class Period time period between 2009-2012, Ocwen, Homeward, and Litton (collectively, the "Servicers") had engaged in "unfair and deceptive" servicing practices, including: (1) "providing false or misleading information in response to borrower complaints"; (2) "failing to provide accurate and timely information to borrowers who seek information about loss mitigation services, including loan modifications"; (3) "misrepresenting that loss mitigation programs would provide relief from the initiation of foreclosure or other foreclosure efforts"; (4) "providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good-faith actively pursuing a loss mitigation alternative offered by the Servicers"; (5) "providing false or misleading reasons for denial of loan modifications"; and (6) "failing to properly calculate borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers."

69. Under the CFPB Consent Judgment, Ocwen agreed—with respect to its ***entire*** loan portfolio—to submit to the review of the NMS Compliance Monitor, abide by the NMS Servicing Standards, and implement the same Enforcement Terms that it was required to implement with respect to its ResCap portfolio.

70. The NMS Servicing Standards were also incorporated into the 2011 NYDFS Agreement pursuant to its provision stating that in the event Ocwen "agrees with any other

regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

71. The market understood that increased scrutiny from regulators, such as the NYDFS, could restrict Ocwen's ability to acquire additional MSRs. Accordingly, Defendants frequently publicly addressed Ocwen's compliance with applicable servicing standards throughout the Class Period in order to allay any investor concerns regarding its continued growth.

72. However, contrary to Defendants' repeated representations, which assured investors that Ocwen was satisfying its regulatory obligations, the NYDFS's findings from its Monitor's two-year review into Ocwen's servicing operations revealed that, in fact, Ocwen was violating the terms of the 2011 DFS Agreement and 2012 DFS Agreement, as well as the terms of the NMS. These findings, which the NYDFS disclosed through a series of public letters to Ocwen dated February 26, 2014 (the "February 26, 2014 Letter"), April 21, 2014 (the "April 21, 2014 Letter"), August 4, 2014 (the "August 4, 2014"), and which Defendants publicly denied during the Class Period, were ultimately stipulated to and agreed upon by Ocwen in a second Consent Order Pursuant to New York Banking Law § 44 filed on December 22, 2014 (the "2014 Consent Order"), which revealed the full truth regarding Defendants' false statements during the Class Period.

### A. Defendants' Misrpresentations Regarding The Scalability And Compliance Capabilities Of Ocwen's Technology Systems

73. A key concern of the NYDFS in requiring Ocwen to enter into the 2012 Consent Order was whether Ocwen "has sufficient capacity to properly board and manage a significant portfolio of stressed loans, including the ability to effectively manage the increased volume and

comply with" applicable servicing requirements. Accordingly, as set forth above, the terms of the 2012 NYDFS Consent Order purportedly addressed these concerns. During the Class Period, however, Ocwen set about assuring investors that the Company was satisfying its obligations to the NYDFS with respect to the capacity and scalability of its servicing platform to handle a large influx of loans, thereby advancing its growth story. To this end, during the Class Period and following Ocwen's entry into the 2012 Consent Order with the NYDFS, Defendants made the following statements touting the purported "scalability" and compliance capabilities of Ocwen's technology systems:

a) On a May 2, 2013 investor conference call Defendant Faris stated that: "To date, the Homeward and ResCap integrations are proceeding according to plan. . . . ***This rapid integration of almost $80 billion of UPB onto Ocwen's platform demonstrates the unique scalability of our technology***."

b) In Ocwen's 1Q 2013 Form 10-Q filed with the SEC on May 8, 2013, in the 2Q 2013 Form 10-Q filed with the SEC on August 6, 2013, and in the 3Q 2013 Form 10-Q filed with the SEC on November 5, 2013, Ocwen that: "***Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.***

c) On August 1, 2013 in Ocwen's investor conference call, Defendant Erbey stated that: "[T]he design of our systems and platform allow us to manufacture new capacity more efficiently and effectively than other servicers."

d) On an October 31, 2013 investor conference call with respect to the transfer of ResCap loans from the FiServ platform to REALServicing, Defendant Faris stated that "we have been careful to assure . . . strong compliance throughout the transfer process."

e) In the 2013 Form 10-K filed with the SEC on March 3, 2014, Ocwen stated with regard to the Company's "Scalable and Compliant Servicing Platform" that: "We also believe that ***our platform enables us to operate in a compliant manner in an increasingly complex and highly regulated environment***."

f) During the May 1, 2014 investor conference call, Defendant Faris stated that: "In many cases, [competitors'] platforms are not capable of automating the new requirements efficiently or effectively. ***Ocwen's platform on the other hand is designed in such a way that we can more easily automate requirements than others***."

74. In the 2014 NYDFS Consent Order, Ocwen ***stipulate[d]***," "***agree[d]***," and otherwise admitted to the following facts establishing that the foregoing statements were materially false and misleading when made:

a) "Ocwen's core servicing functions rely" upon "inadequate and ineffective information technology systems" consisting of "a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible."

b) "As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records" with "insufficient controls in place—either manual or automated—to catch all of these errors and resolve them."

c) "Ocwen's systems have been backdating letters for years[,]" and "Ocwen's processes failed to identify and remedy these errors."

d) "***With Ocwen's rapid growth and acquisitions of other servicers***, the number of . . . comment codes" that Ocwen's technology systems use to service its increased volume of loans "has ballooned to more than 8,400 such codes," and "[o]ften, ***due to insufficient integration following acquisitions of other servicers***, there are duplicate codes that perform the same function[,]" creating "***an unnecessarily complex system of comment codes***, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

e) "Ocwen's inadequate infrastructure . . . [has] resulted in Ocwen's failure to fulfill its legal obligations" because "[p]rior to the [NYDFS's] and the Compliance Monitor's review, Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 Agreement."

75. Moreover, as discussed herein, multiple former Ocwen employees have confirmed that these admitted facts existed and were known to Ocwen and its senior managers throughout the Class Period.

76. Additionally, on December 16, 2014, the NMS Monitor responsible for overseeing Ocwen's compliance with the NMS Servicing Standards issued a critical report which confirmed the inadequacies of Ocwen's servicing platform and how it undermined Ocwen's compliance with the NMS and its public statements regarding the competitive advantage Ocwen

purportedly held by virtue of its servicing platform during the Class Period. The NMS Monitor determined that, contrary to Defendants' statements regarding Ocwen's ability to maintain compliance while transferring the RespCap portfolio from FiServ onto REALServicing, this process had in fact prevented the Company's IRG from testing such loans for one of the metrics used to evaluate its compliance with the NMS Servicing Standards in accordance with the Enforcement Terms of the NMS.

**B. Defendants' Misrepresentations Regarding Ocwen's Regulatory Compliance During The Class Period**

77. Defendants made the following materially misleading statements throughout the Class Period regarding Ocwen's ability to comply, and its contemporaneous compliance, with applicable regulations:

a) Defendant Faris's statement during Ocwen's investor conference call on October 31, 2013 that: "Earlier this month, the CFPB provided guidance to mortgage servicers for implementing new rules announced earlier this year and scheduled to take effect in 2014. . . . Ocwen is well positioned to comply with all the new requirements."

b) Ocwen's representations in its investor presentation prepared in connection with the Company's investor conference call on December 3 and 4, 2013 that "Ocwen's Compliance Management System . . . . [r]eviews operations to ensure responsibilities are carried out and legal requirements are met; and [t]akes corrective action and updates tools, systems, and materials as necessary." Investor Day Presentation, December 3-4, 2013, filed with SEC on Form 8-K on December 3, 2013.

c) Ocwen's representation in its investor presentation prepared in connection with the Company's investor conference call on December 3 and 4, 2013 regarding "CFPB Mortgaging Servicing Rules" that "[o]n January 10, 2014, the new CFPB rules for mortgage servicing will go into effect, amending RESPA and TILA," and the "Company believes it is on track for full compliance prior to the effective date." *Id.*

d) Ocwen's representation in its investor presentation prepared in connection with the Company's investor conference call on December 3 and 4, 2013 regarding "OCC Consent Orders and National Mortgage Settlement" that "Ocwen is not a party to these orders and settlements, but Ocwen services or subservices loans for

parties which are subject to these settlements and therefore services in compliance with those standards as applicable." *Id.*

e) Ocwen's Deputy Counsel, Andrew Wein's statement during Ocwen's investor conference call on December 3 and 4, 2013 Conference that "[t]he Company believes that we're on track for full compliance [with the new rules promulgated by the CFPB] prior to the effective date."

f) Defendant Erbey's representation in Ocwen's press release issued on May 1, 2014 that: "We consider our solid balance sheet, ***National Mortgage Settlement compliance*** and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantital competitive advantages."

78. The foregoing statements regarding the Company's regulatory compliance were materially false and misleading when made because in the 2014 NYDFS Consent Order, which Defendant Faris signed on behalf of the Company, Defendants Faris and Ocwen "***stipulate[d]***," "***agree[d]***," and otherwise admitted that, *inter alia*:

a) "In the course of the Compliance Monitor's review" of Ocwen's servicing operations, which began in July 2013, "it identified numerous and significant violations of the 2011 Agreement, as well as New York State laws and regulations."

b) "For example, a limited review by the Compliance Monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan," including: (1) "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;" (2) "failing to ensure that its statements to the court in foreclosure proceedings were correct;" (3) "pursuing foreclosure even while modification applications were pending ('dual tracking');" (4) "failing to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty; and (5) "failing to assign a designated customer care representative."

c) Ocwen "regularly [gave] borrowers incorrect or outdated information, "sen[t] borrowers backdated letters, unreliably track[ed] data for investors, and maintain[ed] inaccurate records."

d) "Ocwen's systems have been backdating letters for years[,]" and "Ocwen's processes failed to identify and remedy these errors."

e) "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations. Prior to the Department's and the

Compliance Monitor's review, Ocwen did not take adequate steps to implement reforms that it was legall obligated to implement pursuant to the 2011 Agreement."

f) "Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource" and "reported directly to Mr. Erbey in both capacities" but "seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer."

79. Additionally, the NMS Monitor determined that the IRG's processes and procedures for Test Period 7, which was the quarter ended March 31, 2014, and coincided with the the NMS's first test of Ocwen's platform RealServicing following the transition of ResCap loans to that platform, "lacked the critical keys to integrity mandated in the Enforcement Terms, namely 'an internal quality control group that is independent from the line of business whose performance is being measured.'"

80. This was because, among other things, as subsequently disclosed in the NMS Monitor's Second Interim Report on May 7, 2015, the IRG had "one reporting line. . . . to Servicer's Chief Risk Officer", S.P. Ravi, who until February 2014, simultaneously served as Altisource's Chief Risk Officer. In other words, in violation of the requirements that the IRG have an independent oversight function over Ocwen's servicing platform as required by NMS, Ocwen had, effectively, entrusted an Altisource employee that supplied the very same platform that IRG was to monitor.

81. Moreover, the NMS Monitor responsible for overseeing Ocwen's compliance with the NMS Servicing Standards determined that, contrary to Defendants' statements regarding Ocwen's compliance with the NMS, Ocwen had not properly implemented the Enforcement Terms under the NMS with respect to the IRG. In particular, the NMS Monitor disclosed as follows:

a) As set forth in its First Interim Report, the NMS Monitor had notified Ocwen's general counsel by a letter dated May 19, 2014 that he had "received allegations of irregularities and improprieties relative to the IRG and its work" and would be initiating an investigation into these allegations.

b) The First Interim Report further disclosed that after a follow-up interview with the IRG employee in early June 2014, the IRG Investigation Team notified Ocwen's general counsel by letter that the documents and information provided by the IRG employee confirmed that the IRG employee's allegations were "plausible and that further investigation was therefore warranted."

c) According to the First Interim Report, after concluding the IRG Investigation, the NMS Monitor notified Ocwen's general counsel by letter dated August 29, 2014 that he had determined that the work of the IRG could not be relied upon and that the IRG had not correctly implemented the Enforcement Terms relating to its work under the NMS in a number of material respects during Test Period 7 based upon evidence of "an under-staffed IRG during Test Period 7 and a dysfunctional and chaotic working environment within the IRG during that Test Period[,] . . . which led to serious problems and flaws in the processes and procedures by which the IRG tested loans against numerous Metrics during Test Period 7, including (1) the inability of the IRG Executive to certify the results for Test Period 7 without prior written assurances from a member of [Ocwen's] in-house legal department and (2) Metric 19 being tested improperly, leading to the results for that metric being reported inaccurately."

d) Finally, the First Interim Report concluded that the IRG's processes and procedures for Test Period 7 "lacked the critical keys to integrity mandated in the Enforcement Terms, namely 'an internal quality control group that is independent from the line of business whose performance is being measured.'" In particular, and contrary to the requirement under the Enforcement Terms that the IRG "ultimately report[] to a Chief Risk Officer, Chief Audit Executive, Chief Compliance Officer, or another employee or manager who has ***no direct operational responsibility for mortgage servicing***," the NMS Monitor's Second Interim Report disclosed that the IRG previously had only "one reporting line. . . . to Servicer's Chief Risk Officer" who, from the time Ocwen became subject to the NMS with respect to the ResCap portfolio in February 2013 and his removal in February 2014, was also Altisource's Chief Risk Officer, S.P. Ravi.

82. On May 7, 2015, the NMS Monitor reported to the U.S. District Court for the District of Columbia the following:

> While our testing continues, Ocwen has taken a number of actions to address previous problems with its internal review group. Specifically, Ocwen replaced the executive who leads the IRG and otherwise reorganized employees, adopted corporate governance principles, and enhanced my access to information. I also created a hotline to allow any concerned employees to contact me directly and

> anonymously if they see problems. As a result of these actions, I report to the Court that Ocwen internal review group's independence, competency and capacity have shown measurable improvement.

### C. Defendants' Misrepresentations Regarding Its Internal Controls To Avoid Potential Conflicts Of Interest With Related Parties

83. As discussed above, Defendant Erbey's formation of the Erbey Companies, which ensured that he stood to profit at every step of the mortgage life cycle, created the material risk that he would place his own interests ahead of the interests of homeowners in violation of regulatory controls designed to protect them. Acknowledging investor's focus on the regulatory risk posed by Defendant Erbey's conflicting roles, Defendants assured the market throughout the Class Period that Ocwen had controls in place to manage potential conflicts with the Erbey Companies.

84. For instance, during the December 2013 Conference, Defendant Erbey stated:

> One of the things I like to stress again is that the strategic allies are not affiliates, that each company has its own separate Board of Directors, the majority of whom are independent, and ***we have robust related party transaction approval process[es]. Any related party transactions between the companies I actually recuse myself from that decision.*** And we make all of our – very importantly, we make all of our contracts between the companies publicly available to you on our website.

85. Moreover, Ocwen represented to the market that Defendant Erbey recused himself from all negotiations and approvals concerning transactions between Ocwen and the Erbey Companies. For instance, in its 2013 Form 10-K, Ocwen stated that because Defendant Erbey's "ownership interests could create, appear to create or be alleged to create conflicts of interest with respect to matters potentially or actually involving or affecting [Ocwen] and Altisource, HLSS, AAMC and Residential," the Company has:

> adopted policies, procedures and practices to avoid potential conflicts with respect to [its] dealings with Altisource, HLSS, AAMC and Residential, ***including our Executive Chairman [Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential***

> ***conflicts of interest through oversight by independent members of our Board of Directors*** (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.

86. In addition, Defendants made the following statements throughout the Class Period regarding Ocwen's ability to avoid potential conflicts of interest arising from related-party transactions:

a) "We have adopted policies, procedures and practices to avoid potential conflicts of interest involving significant transactions with related parties such as Altisource, including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions." 2012 Form 10-K at 28, incorporated by reference in each of Ocwen's 1Q 2013 Form 10-Q, 2Q 2013 Form 10-Q, and the 3Q 2013 Form 10-Q filed with the SEC on May 8, 2013, August 6, 2013, and November 5, 2013, respectively.

b) "[W]e have robust related party transaction approval process. Any related party transactions between the companies I actually recuse myself from that transaction." Defendant Erbey, December 2013 Investor Conference Call, December 3, 2013 Tr. at 5.

c) "We have adopted policies, procedures and practices to avoid potential conflicts of interest with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transcactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors." 2013 Form 10-K filed with the SEC on March 3, 2014 at 18.

d) "Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them." 2014 Proxy filed with the SEC on April 22, 2014 at 44.

e) "We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers." 1Q 2013 Form 10-Q at 35, the 2Q 2013 Form 10-Q at 39, the 3Q 2013 Form 10-Q at 41, the 2013 Form 10-K at F-60, and the 1Q 2014 Form 10-Q at 36, filed with the SEC on on May 8, 2013, August 6, 2013, November 5, 2013, March 3, 2014, and May 2, 2014, respectively.

87. The foregoing statements were materially false and misleading when made because in the 2014 Consent Order, which Defendant Faris signed on behalf of the Company, Defendants Faris and Ocwen "stipulate[d]," "agree[d]," and other admitted that, inter alia:

a) "Ocwen's mortgage servicing practices" involve "a number of conflicts of interest between Ocwen and four other public companies . . . . Yet, Ocwen does not have a written policy that explicitly requires conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."

b) "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of Altisource . . . , has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced place insurance program in early 2014."

c) "In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

d) "Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors."

88. With respect to Defendants' admission regarding the rates charged by Hubzu, the NYDFS's April 21, 2014 Letter disclosed that during the course of its investigation into Ocwen, the Monitor uncovered that while Ocwen used Altisource's Hubzu portal as its principal online auction site for the sale of both homes facing foreclosure and investor-owned properties following foreclosure, Hubzu charged Ocwen-serviced properties an above-market auction fee of 4.5% for listing on its website. This fee was ***up to three times*** the fees Hubzu charged to non-Ocwen customers. In particular, the NYDFS's April 21, 2014 Letter revealed:

> In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market,

> its fee is as low as 1.5%. These higher fees, of course, ultimately get passed on to the investors and struggling borrowers who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

89. As further set forth in the April 21, 2014 Letter, the Monitor also uncovered that "the underlying HTML code" for Hubzu's website actually queries whether Ocwen is the seller of the property being listed on Hubzu. For those properties where Ocwen was the seller, the NYDFS concluded that the auction fees paid to Hubzu were higher.

90. Moreover, as specifically revealed by the NYDFS in the August 4, 2014 Letter, "[i]n August 2013, Ocwen appointed an Altisource subsidiary named Beltline Road Insurance Agency, Inc. ("Beltline") as its exclusive insurance representative." Beltline (which Ocwen had sold to Altisource after acquiring Beltline from ResCap and then contracted with Altisource to make Beltine its exclusive insurance placement agent) was tasked with finding an insurance company to provide Ocwen with force-placed insurance, as its existing force-placed arrangement with Assurant was set to expire in March 2014.

91. According to the August 4, 2014 Letter, in January 2014, Altisource recommended that Ocwen use SWBC as its "managing general agent" to oversee the Company's force-placed insurance program and to negotiate premiums with other insurance companies. *Altisource then recommended itself to provide certain fee-based services to SWBC in connection with this arrangement.* Thus, as part of the contract with SWBC, SWBC would provide insurance services to Ocwen, Ocwen would pay fees to SWBC, and SWBC would pay fees to Altisource, thus creating a direct benefit for Defendant Erbey. This transaction falls squarely within the definition of a related party transaction under the rules promulgated pursuant to the Securities and Exchange Act, Item 404, 17 C.F.R. § 229.404, which defines a transaction with a related person as one "in which the registrant was or is to be a participant and the amount

involved exceeds $120,000, and **in which any related person had or will have a direct or indirect material interest**."

92. According to the NYDFS's Monitor's findings set forth in the August 4, 2014 Letter, Altisource's proposal was presented to the Credit Committee of Ocwen Mortgage, Servicing, Inc., which consisted of Richard Cooperstein, Ocwen's Chief Financial Officer, Duo Zhang, Ocwen's Vice President of Quantitative Analytics, and Defendant Erbey. Neither Cooperstein nor Zhang are members of the Ocwen Board of Directors but rather operational officers of the Company. The transaction was not presented to any member of Ocwen's Board of Directors other than Defendant Erbey. Through e-mails dated January 15 and 16, 2014, Cooperstein, Zhang and Defendant Erbey approved of this related-party arrangement and the direct benefit that would flow to Altisource. Based on Defendant Erbey's approval and without any further consideration by other Ocwen directors or executives, Ocwen executed contracts formalizing this force-placed arrangement on June 1, 2014. As admitted by Ocwen in the 2014 NYDFS Consent Order, this was one of **"several transactions with the related parties"** approved by Defendant Erbey without the mandated independent oversight and in stark contradiction to Ocwen's public disclosures.

93. The NYDFS concluded from its review of internal Ocwen documentation related to this transaction in the August 4, 2014 Letter that Altisource, and thus Erbey, received a direct benefit from Ocwen's transaction with SWBC. In particular, Ocwen agreed to give all of its force-placed business to SWBC, and in exchange SWBC agreed to pass on "15% of net written premium on the policies" to Beltline, an Altisource subsidiary. These fees, which were for "insurance placement services," amounted to roughly $60 million per year for Altisource.

94. On October 5, 2015, the SEC identified further examples of related party transactions that were approved by Erbey. On that day, as part of the administrative proceeding styled *In the matter of Home Loan Servicing Solutions, Ltd.*, File No. 3-16882, the SEC issued Release No. 76074 titled "Order Instituting Case-and-Desist Proceedings, Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sactions and a Cease-and-Desist Order." According to the SEC Release, the matter involved, in part, HLSS's "misstatements . . . concerning related party transactions." SEC Release ¶ 1.

95. Specifically, the SEC Release states that, like Ocwen, "HLSS inaccurately disclosed that it had policies governing conflicts of interest inherent in related party transactions, ***which included the recusal of its Chairman of the Board*** . . . from negotiating and approving transactions with related parties such as Ocwen . . . for which the Chairman also served as Executive Chairman." *Id.* Moreover, HLSS publicly represented to its shareholders that it had "adopted policies, procedures and practices to avoid potential conflicts," *id.* at ¶¶ 2, 12, inherent in related party transactions when, in fact, no such formalized policies existed. HLSS's public disclosures in this regard were virtually identical to Defendants' own representations that, *inter alia*, Ocwen had "adopted policies, procedures and practices to avoid potential conflicts of interest," which "include[ed] Mr. Erbey's recusal from negotiations regrading and credit committee and board approvals of [related party] transactions." *See supra* ¶¶ 84-86 (referencing statements in Ocwen's 2013 Form 10-K, 2014 10-K, 1Q 2013 Form 10-Q, 2Q 2013 Form 10-Q, 3Q 2013 Form 10-Q, and 2014 Proxy, along with statements made during December 2013 Conference). The SEC found, however, that "the practice at HLSS for recusals was ***not consistent with its public disclosures.***" SEC Release ¶ 13.

96. Indeed, the SEC found that "[a]lthough the Chairman had a practice of recusing himself from certain negotiations and approvals of related party transactions, that practice was ***inconsistent and ad hoc***." *Id.* at ¶ 3. Indeed, the SEC Release contains detailed evidence of Erbey's direct participation in the approval of related party transactions. In particular, the SEC Release states that, throughout 2012 and 2013, HLSS purchased rights to MSRs from Ocwen through nine separate transactions. The parties' negotiations of these transactions involved, among other things, determining what portion of the servicing fees would be retained by HLSS, and what portion would be remitted to Ocwen. HLSS's Credit Committee was required to approve each of these transactions, and Erbey—in his capacity as a member of the HLSS Credit Committee—approved ***all five*** of the transactions that occurred in 2012, which totaled approximately $67.5 billion in UPB. Erbey approved another such transaction in 2013. According to the SEC, "[w]hen the Chairman reviewed and approved these transactions, he typically did the same on the Ocwen side of the transactions either through Ocwen's Credit Committee or its Executive Committee which acted on behalf of the Board when it was not in session." *Id.* at ¶ 20.

97. The SEC also uncovered evidence of Erbey's direct approval of a 2014 transaction with HLSS. Specifically, Erbey approved a transaction between Ocwen and HLSS concerning the sale of $672 million in "early buy-out" loans, which are delinquent loans that are eligible for purchase by mortgage servicers like Ocwen. According to the SEC, these loans "comprised the ***most delinquent portion*** of a portfolio of early buy-out loans that Ocwen had recently purchased." *Id.* at ¶ 21. In approving the transaction in February 2014, Erbey sent an email to senior management at ***both*** Ocwen and HLSS stating that he would approve the purchase "on the condition that it did not trigger losses for HLSS." *Id.*

98. The SEC found that Defendant Erbey's participation in the approval of these related-party transactions amounted to a violation of "Section 13(a) of the Exchange Act, Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, which require issuers to file true, accurate, and complete annual, quarterly and current reports with the Commission." *Id.* at ¶ 39. Notably, like Rule 10b-5, Rule 12b-20 requires issuers' reports to disclose "material information . . . necessary to make the required statements, in light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20.

**D. Defendants' False Assurances To Its Investors Regarding The Letter-Backdating Issue**

99. As noted above, contrary to Ocwen's representations to the market, the Company's technology systems were unable to manage the growth in Ocwen's servicing portfolio while ensuring compliance with all applicable regulations. In the October 21, 2014 Letter, the NYDFS revealed that the Monitor uncovered one such severe regulatory shortcoming: the Company's widespread and shocking practice of backdating certain loan modification denial letters that Ocwen sent to its borrowers during the Class Period. Moreover, the October 21, 2014 Letter disclosed that when the Monitor demanded an explanation from Ocwen regarding this issue, Ocwen falsely represented to the Monitor that the problem affected 6,100 letters, that Ocwen discovered the issue in April or May of 2014, and that Ocwen had changed its systems in May 2014 to resolve the problem. According to the October 21, 2014 Letter, however, "[e]ach of these representations turned out to be false."

100. Despite Ocwen's failure to inform and outright lies to the Monitor in connection with the letter-backdating issue, Defendants repeatedly assured investors during the Class Period that the Company was cooperating with the NYDFS in connection with Ocwen's implementation

and the NYDFS's monitoring of compliance under the 2012 Consent Order through the following statements:

a) "Ocwen continues to work cooperatively with the New York Department of Financial Services to address their concerns that led to an indefinite hold on our Wells Fargo transaction." Defendant Faris, Ocwen's press release issued on May 1, 2014.

b) "[w]e continue to cooperate with the New York Department of Financial Services." Defendant Faris, Investor Conference Call on July 31, 2014, Tr. at 6.

c) "[I]n early February 2014, the NYDFS requested that OLS [Ocwen Loan Servicing] put an indefinite hold on an acquisition of MSRs and related servicing advances from Wells Fargo, and we agreed to place the transaction on indefinite hold. We are cooperating with the NYDFS on this matter." 2013 Form 10-K/A filed with the SEC on August 18, 2014 at 13.

d) "On December 5, 2012, we entered into a Consent Order with the NYDFS in which we agreed to the appointment of a Monitor to oversee our compliance with an Agreement on Servicing Practices. The Monitor began its work in 2013, and we continue to cooperate with the Monitor. . . . In early February 2014, the NYDFS requested that Ocwen put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. (Wells Fargo) of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion. The NYDFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold. We are cooperating with the NYDFS on this matter." 1Q14 Form 10-Q/A filed on August 18, 2014 at 40.

e) "In December 2012, we entered into a Consent Order with the New York Department of Financial Services (NYDFS) in which we agreed to the appointment of a Monitor to oversee our compliance with an Agreement on Servicing Practices. The Monitor began its work in 2013, and we continue to cooperate with the Monitor. . . . In early February 2014, the NYDFS requested that Ocwen put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion. The NYDFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold. The NYDFS has also inquired about certain other aspects of our business, including certain aspects of our business dealings with Altisource, HLSS, AAMC and Residential, the interests of our directors and executive officers in these companies, an online auction business owned by Altisource, the role of Altisource in certain lender-placed insurance arrangements and the provisions contained in releases we use in

connection with litigation settlements. We are cooperating with the NYDFS on these matters." 2Q14 Form 10-Q filed on August 18, 2014 at 47

101. The foregoing statements were materially false and misleading when made because in the 2014 NYDFS Consent Order, which Defendant Faris signed on behalf of the Company, Defendants Faris and Ocwen "stipulate[d]," "agree[d]," and otherwise admitted that, *inter alia*:

> Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance. Ocwen ignored the issue for five months until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery.

102. As set forth in further detail in the NYDFS's October 21, 2014 Letter to Ocwen, after the DFS Monitor had initially discovered the backdating issue on June 19, 2014 and "immediately demanded an explanation" from the Company:

> Over the course of the next three months, Ocwen represented to the Department and the Monitor that (1) the issue was isolated to letters of a specific type, (2) the problem affected approximately 6,100 letters, (3) Ocwen discovered the issue in April or May of 2014, and (4) Ocwen implemented changes to its systems in May 2014 that resolved the problem. Each of these representations turned out to be false.
>
> * * *
>
> Subsequently, under pressure from the Department and the Monitor to identify and disclose the full extent of this issue, Ocwen finally admitted in a memorandum on September 10, 2014, that the backdating issue may not be isolated and that the changes to Ocwen's systems in May 2014 did not fully resolve the problem. However, Ocwen identified only a fraction of the instances of backdating that had already been uncovered by the Monitor.
>
> The memorandum also repeated the assertion that Ocwen initially discovered the backdating issue in April 2014. However, after persistent questioning from the Monitor for more details surrounding the discovery of the issue, Ocwen informed the Monitor that its investigative team had been mistaken once again. Upon further investigation, Ocwen discovered that one of its employees had identified

> the problem in November 2013 and informed senior management, including the Vice President of Compliance.
>
> There is no indication that Ocwen did anything to investigate or remedy the problem in November 2013, nor did it alert its regulators, borrowers, or other interested parties to this issue. . . . It is unclear what Ocwen did, if anything, in April 2014 to ivnestigate the cause of this problem, its scope, or appropriate remedial measures. What is clear is that it still did not notify regulators, borrowers, or investors of this significant issue.

103. Thereafter, on October 21, 2014, Ocwen issued a press release in response to the NYDFS's October 21, 2014 Letter, which stated as follows:

> Ocwen regrets that, due to software errors in our correspondence systems, we inadvertently sent improperly dated letters to some borrowers. As always, our goal is to avoid foreclosure. In the case of the 283 borrowers in New York who received letters with incorrect dates, 281 are currently borrowers with us. We are continuing to review the rest of the cases. We believe that we have resolved the letter dating issues that have been identified to date, and we continue our investigation as to whether there are additional letter dating issues that need to be resolved. We are working with and fully cooperating with DFS and the Monitor to address their concerns.

104. The foregoing statement was materially false and misleading when made because in the 2014 Consent Order, which Defendant Faris signed on behalf of the Company, Defendants Faris and Ocwen "stipulate[d]," "agree[d]," and other admitted that at least 6,100 borrowers had been affected by the letter-backdating issue.

105. In addition, just several hours after Ocwen made this statement, it issued a subsequent press release entitled "Ocwen Corrects Earlier Statement in Response to Letter From New York Department of Financial Services," wherein it stated, "Ocwen wishes to correct its statement in a press release earlier today that 283 borrowers in New York received letters with incorrect dates. Ocwen is aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were."

### E. Defendants' Statements Concerning The Cost Effectiveness Of Ocwen's Servicing Platform Were Materially Misleading To Investors Given The Compliance Shortfalls That Were Not Accounted For In the Purported Cost Savings

106. In addition to the foregoing statements, Defendants also represented to investors that Ocwen's servicing platform provided it with a purported 70% cost advantage over its competitors. These statements raised concern for Superintendent Lawsky, who noted during the Class Period that "[t]hose kinds of cost-saving claims bear special scrutiny" and that regulators need to ask whether such claims are "too good to be true." Nevertheless, throughout the Class Period, Defendants made the following representations to investors:

a) Defendant Erbey stated during an August 1, 2013 conference call that Ocwen "***enjoys substantive and sustainable competitive advantages within the servicing business***" and that its "***cost to service non-performing loans is 70% lower than the industry average.***"

b) In investor presentations attached to Forms 8-K filed with the SEC on September 9, 2013 and November 12, 2013 Ocwen highlighted the "***70% cost advantage***" afforded by Ocwen's servicing platform.

c) During an October 31, 2013 investor conference call, Defendant Faris stated that Ocwen's servicing platform "has ***substantial cost advantages*** over the rest of the market," which were "***70% lower*** then (sic) the industry average for non-performing loans."

d) The 2013 Form 10-K stated that Ocwen's "cost of servicing non-performing, non-Agency loans on the REALServicing platform is approximately 70% lower than industry averages."

107. At the time each of the foregoing representations was made, it was materially misleading to investors because, as discussed more fully above, the purported "substantial cost advantages" enjoyed by Ocwen were the result of its servicing platform's inability to comply with the NMS and other regulatory obligations. Indeed, as Ocwen attempted to remedy the multitude of compliance deficiencies that existed throughout the Class Period, its compliance-related costs skyrocketed, beginning with its May 1, 2014 and then July 31, 2014 disclosures that

Ocwen was actually incurring substantially higher servicing costs to address compliance deficiencies.

**F. The Truth Regarding Defendants' Misconduct Is Gradually Revealed**

108. As the truth regarding Ocwen's related-party dealings and other wrongful servicing practices were revealed to the market between February 6, 2014 and December 22, 2014, Ocwen's share price plunged.

**1. The NYDFS Places An Indefinite Hold On The Wells Fargo Transaction And Identifies Numerous Compliance-Related Concerns In Multiple Public Letters To The Company**

109. On February 6, 2014, Ocwen revealed that the NYDFS was putting "an indefinite hold" on the proposed $39 billion Wells Fargo transaction due to "concerns about Ocwen's servicing portfolio growth." Ocwen's share price declined $1.82 in response to this news, from a close of $43.20 on February 5, 2014 to $41.38 on February 6, 2014.

110. Less than three weeks later, the NYDFS published the February 27, 2014 Letter to Ocwen regarding its concerns about "potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated." In particular, the NYDFS identified S.P. Ravi's dual role as Chief Risk Officer of both Ocwen and Altisource.

111. Nevertheless, when the Company filed its 2013 Form 10-K, it reaffirmed its previous representations that the Company has "policies, procedures and practices to avoid potential conflicts" with respect to its related-party transactions, that the Company entered into related-party transactions at "market rates," and that Defendant Erbey "recus[es] himself from negotiations regarding, and approvals of, transactions with" the Erbey Companies.

112. Shortly after Ocwen reaffirmed the effectiveness of its related-party controls, the NYDFS sent the April 21, 2014 Letter to Ocwen. This time, the NYDFS publicly revealed the

inflated rates Hubzu was charging Ocwen borrowers for the sale of homes facing foreclosure. The NYDFS stated in the April 21, 2014 Letter:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting borrowers and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business in the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs.

113. The increased regulatory focus on Ocwen's servicing practices took a dramatic toll on the Company's financial position during the first half of 2014. On May 1, 2014, upon releasing its 1Q 2014 financial results, the Company reported that higher industrywide compliance costs raised Ocwen's cost to service non-performing loans by as much as $40 per loan annually. However, Defendant Erbey noted that even in this higher cost environment, Ocwen's continued compliance with the National Mortgage Settlement provided Ocwen with a "substantial competitive advantage[]" over its peers.

114. On July 31, 2014, Ocwen revealed that – contrary to its prior representations concerning its ability to service loans in full compliance with its regulatory obligations at a 70% discount to other servicers – its compliance costs were actually much higher. In particular, the Company revealed that during the second quarter of 2014 alone, it incurred "roughly $12 million of expenses for the New York state and national monitors," that it "expect[ed] to incur roughly $9 million in the third quarter in ongoing monitoring costs," and that such costs "are a significant element of [Ocwen's] cost base."

115. In the August 4, 2014 Letter, the NYDFS raised additional concerns regarding the Company's force-placed insurance agreement with Altisource and SWBC and, citing evidence

indicating that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."

116. The NYDFS went on to state in the August 4, 2014 Letter that "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings," noting that "despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies," Defendant Erbey was central to approving the force-placed transaction involving Altisource. The NYDFS characterized Defendant Erbey's role in the approval of this force-placed program as a "gross violation of this supposed recusal policy."

117. Moreover, the NYDFS disclosed in the August 4, 2014 Letter that it had "uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies," despite Defendants' contrary representations to the market.

118. Oppenheimer analyst Ben Chittenden issued a report the same day noting that the August 4, 2014 Letter "indicates that little progress has likely been made in resolving the issues between OCN and the NYDFS, and that the overhang will remain for much longer than we had anticipated." In light of this, Chittenden "remov[ed] all MSR acquisitions . . . from [his] model between now and YE15," and as a result he downgraded Ocwen's shares and removed his $36 price target for the Company's common stock.

119. The next day, Compass Point analyst Kevin Barker lowered his rating to Neutral from Buy and lowered his EPS estimates for fiscal years 2014 and 2015, indicating that the August 4, 2014 Letter increased the risk that the Wells Fargo servicing deal "gets cancelled and other servicing transfers remain on hold."

120. Further evidencing the lack of controls over Ocwen's related-party transactions, Ocwen announced on August 12, 2014 that it was restating its financial statements for fiscal year 2013 and the first quarter of 2014. In particular, the Company shifted $17 million in pre-tax income from the first quarter of 2014 to fiscal year 2013 due to a related-party transaction with HLSS, and announced that it "anticipates it will determine that a material weakness existed in the relevant time periods" concerning methodology for valuing transactions with HLSS.

121. Analyst Bose George, analyst at Keefe, Bruyette & Woods, noted that while the restatement "looks relatively benign by itself . . . the real issue is that they can't grow until they resolve the regulatory questions, and the regulatory problems are nowhere near resolved."

122. A week later, on August 18, 2014, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q 2014 (the "2Q 2014 Form 10-Q") and disclosed that on June 12, 2014, the Company "received a subpoena from the SEC requesting production of various documents related to our business dealings with Altisource, HLSS, AAMC and [RESI] and the interests of our directors and executive officers in these companies."

123. Subsequently, the NYDFS exposed its findings concerning Ocwen's practice of backdating communications to its borrowers in the October 21, 2014 Letter. In particular, the NYDFS stated that Ocwen's egregious misconduct in backdating such letters constituted a clear failure to comply with its legal and regulatory obligations:

> Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings. ***Ocwen is not meeting those obligations. And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance***.

124. In the October 21, 2014 Letter, the NYDFS concluded:

> The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.

125. Media reports echoed these sentiments. In particular, in an article published on October 22, 2014 titled "Ocwen's Backdated Letters May Violate Consent Order," Bloomberg quoted Alys Cohen, staff attorney with the National Consumer Law Center, as stating Ocwen's backdating practice "appears to violate the consent order." The article went on to note that under the Consent Judgment, "Ocwen has to ensure that borrowers have 30 days from the date of the written non-approval notice' to ask Ocwen to reconsider."

126. Before the markets closed on October 21, 2014, Ocwen sought to minimize the impact of the backdating scandal by issuing the October 21, 2014 Press Release, in which it indicated that the backdating was "inadvertent," affected only 283 borrowers in New York, and had been fully resolved. These statements served to falsely reassure Ocwen's investors that the NYDFS's concerns were overstated. After the markets closed, however, Ocwen issued a subsequent press release to "correct[]" its prior statements concerning the scope of the backdating issue. In particular, Ocwen stated that, contrary to its representation that backdating affected only 283 borrowers, it was "aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were."

127. On October 24, 2014, following the NYDFS's public disclosure of Ocwen's backdating scandal, Ocwen issued a press release stating that it had written an open letter apologizing to homeowners for the backdating issue. In the letter, Ocwen acknowledged that "letters were dated when the decision was made to create the letter versus when the letter was actually created," and that in some instances "there was a significant gap between the date on the

face of the letter and the date it was actually generated." The Company also announced that it was finally launching hiring an independent firm to investigate "how this happened in the first place" and "why it took . . . so long to fix it."

128. On October 30, 2014, the Company filed a Form 8-K with the SEC attaching a press release announcing its 3Q 2014 financial results (the "October 30, 2014 Press Release"). In particular, Ocwen reported a net loss of $75.3 million, as compared to net income of $60.6 million for the third quarter of 2013, and announced that it had accrued a $100 million reserve for a potential settlement with the NYDFS related to its findings of impropriety at the Company. In the October 30, 2014 Press Release, Defendant Faris attributed Ocwen's lackluster 3Q 2014 financial performance in part to "continued increases in our legal and compliance costs."

129. Finally, analysts' prediction that Ocwen's compliance-related issues would kill the proposed acquisition of $39 billion in MSRs from Wells Fargo came to fruition on November 13, 2014. On that date, Wells Fargo and Ocwen announced that they had mutually agreed to cancel the transaction.

#### 2. The NMS Monitor Publicly Identifies Material Deficiencies In Ocwen's IRG And Severe Flaws In The Company's REALServicing Platform

130. On December 16, 2014, the NMS Monitor filed in the United States District Court for the District of Columbia an interim report regarding Ocwen's compliance with the NMS. The December 16, 2014 NMS Compliance Report revealed critical flaws in Ocwen's REALServicing platform and compliance testing processes that rendered the IRG's work for Test Period 7 unreliable.

131. By way of background, the December 16, 2014 NMS Compliance Report was the fourth periodic report issued with respect to the ResCap portfolio, the third periodic report issued with respect to Ocwen, and the first periodic report with respect to ResCap loans tested on the

REALServicing platform. In each of his prior reports, the NMS Monitor concluded that that IRG's qualifications and performance in connection with the testing of loans on ResCap's FiServ platform "conformed in all material respects to the requirements set out" under the NMS.

132. In contrast to these earlier findings, the December 16, 2014 NMS Compliance Report identified two incidents occurring at the conclusion of Test Period 7 that "brought into question the independence, competence, and capacity of the IRG and the integrity of the testing processes conducted by the IRG."

133. In the first incident, the Company informed the NMS Monitor at the conclusion of Test Period 7 that Ocwen and the IRG "were having difficulty identifying and extracting valid loan testing populations for Metric 19." Metric 19 is titled "Loan Modification Document Collection Timeline Compliance." Critically, the NMS Monitor reported that "***[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ was said to be the reason for such difficulties***."

134. In the second incident, which occurred in early May 2014, the NMS Monitor received emails from a current IRG employee alleging "irregularities and improprieties relative to the IRG and its work[,]" during Test Period 7. In particular, the employee alleged that: (i) Ocwen "was not complying with the terms and conditions" of the Consent Judgment; (ii) "the IRG's processes and procedures were severely flawed[;]" (iii) "the IRG's processes and procedures were not sufficiently independent[;]" and (iv) "the results of the IRG's work could not be relied upon."

135. Accordingly, the NMS Monitor undertook an investigation into these allegations and engaged an independent accounting firm, McGladrey, to re-test a number of metrics for Test Period 7. Through this investigation, the NMS Monitor uncovered "an under-staffed IRG . . .

and a dysfunctional and chaotic working environment within IRG" that "led to serious problems and flaws in the processes and procedures by which the IRG tested loans against numerous Metrics during Test Period 7." In particular, the NMS Monitor's investigation revealed: (i) "the inability of the IRG Executive to certify the results for Test Period 7 without prior written assurances from a member of [Ocwen's] in-house legal department[;]" and (ii) "Metric 19 being tested improperly, leading to the results for that metric being reported inaccurately."

136. As a result of these investigative findings, the NMS Monitor concluded in the December 16, 2014 NMS Compliance Report that, at least in Test Period 7, Ocwen had failed to satisfy its obligations under the Consent Judgment with respect to the IRG because the Company lacked an internal quality control group that: (i) was "independent from the line of business whose performance is being measured[;]" and (ii) had "the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessements contemplated" under the NMS.

137. Acknowledging these internal control deficiencies, Ocwen sought to restore the integrity of the IRG by enacting various remedial measures, including: (i) adopting corporate governing principles regarding the independence of the IRG and the integrity of its work; (ii) reorganizing the IRG; (iii) providing the NMS Monitor greater access to loan-testing information; and (iv) establishing a hotline to the NMS Monitor's office for IRG employees to call to report concerns regarding the IRG and its operations.

138. In addition, the December 16, 2014 NMS Compliance Report disclosed that, according to the Company, "the letter dating issue arose because of a mapping issue in the templates used to create correspondence on its REALServicing platform[,]" which "existed between the trigger date (i.e., the date [Ocwen] made a decision) and the generation or mail date

(i.e., the date that the correspondence was sent) in relation to the letter date (i.e., the date reflected on the correspondence)." Because Ocwen dated most of its letters according to the "trigger date," this process "create[d] a material impact on the accuracy of the letter date when there was a delay between the trigger date and the mail date." In particular, Ocwen "represented that ***the issue is limited to its REALServicing platform because FiServ letters are processed differently and do not use the trigger date as the date on the letters***." Ocwen further identified at least nine metrics that the letter-backdating issue may have impacted.

### 3. Defendant Erbey Resigns As Ocwen Belatedly Reveals The True Extent Of Its Compliance Deficiencies

139. Before the markets opened on December 22, 2014, Ocwen shocked the market when it disclosed that, pursuant to yet another consent order it entered into with the NYDFS concerning its wrongful mortgage servicing practices, Defendant Erbey was resigning as the Company's Executive Chairman, and as the Chairman of Altisource, AAMC, RESI and HLSS.

140. In the 2014 NYDFS Consent Order, which was signed by Defendant Faris and Timothy M. Hayes, Ocwen "agree[d] to the following" facts, among others:

a) The NYDFS monitor's review of 478 loans serviced by Ocwen that had been foreclosed upon "revealed ***1,358 violations of Ocwen's legal obligations***, or about three violations per foreclosed loan," including "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings," "failing to ensure that its statements to the court in foreclosure proceedings were correct," and "pursuing foreclosure even while modification applications were pending";

b) "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies," and, "[a]s a result, ***Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records***";

c) "Ocwen's systems ***have been backdating letters for years,***" and its "processes failed to identify and remedy these errors";

d) "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes

and alerted the company's Vice President of Compliance," and "ignored the issue for five months until the same employee raised it again";

e) "Ocwen has not fully resolved the [backdating] issue to date, more than a year after its initial discovery";

f) "Ocwen's core servicing functions rely on its inadequate systems";

g) REALServicing relies on "an unnecessarily complex system of comment codes," including "more than 8,400" comment codes, "duplicate codes that perform the same function," and "50 different codes for the single function of assigning a struggling borrower a designated customer care representative";

h) "Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors," and according to Ocwen's Chief Financial Officer, "Ocwen [was] simply 'training people to read the scripts and the dialogue engines with feeling.'" throughout the Class Period;

i) "Ocwen's inadequate infrastructure and ineffective personnel ***have resulted in Ocwen's failure to fulfill its legal obligations***," and "[p]rior to the [DFS] review, Ocwen ***did not take adequate steps*** to implement the reforms that it was legally obligated to implement pursuant to the 2011 Agreement";

j) Defendant Erbey and other Ocwen executives and directors "own significant investments in both Ocwen and the related parties," but "Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies";

k) "Mr. Erbey has not in fact recused himself from approvals of several transactions with related parties," and instead "***has participated in the approval of a number of transactions*** between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014";

l) "Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors"; and

m) "Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource" and "reported directly to Mr. Erbey in both capacities."

141. In light of the above facts, Ocwen and Erbey agreed to the following settlement terms, among others, as part of the 2014 NYDFS Consent Order:

a) The payment of $150 million in penalties and restitution;

b) The appointment of an operations monitor, at the sole discretion of the NYDFS, to, among other things, "review and assess the adequacy and effectiveness of Ocwen's operations," determine "what constitutes a 'related party,'" and consult with the Board of Directors to determine whether any member of senior management should be terminated or retained to achieve the goals of complying with Ocwen's legal obligations;

c) Ocwen could only acquire additional MSRs "upon (a) meeting [the] benchmarks developed by the Operations Monitor concerning the adequacy of Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service both those newly acquired and its existing loan portfolio, and (b) the [NYDFS's] approval, not to be unreasonably withheld";

d) Ocwen "will expand its Board of Directors by two independent board members . . . in consultation with the Compliance Monitor or the Operations Monitor," and the board members "will not own equity in any related party";

e) "Ocwen will conduct semi-annual benchmarking studies of pricing and performance standards with respect to all fees or expenses charged to New York borrowers or to investors on New York property by any related party, to determine whether the terms offered by the related party are commensurate with market rates or, if market rates are not available, are reasonably related to actual expenses incurred by the related party";

f) "Effective January 16, 2015, William Erbey will resign from his position as Executive Chairman of Ocwen, his position as Chairman of the Board of Directors of Altisource Portfolio, his position of Chairman of the Board of Directors of Altisource Residential Corporation, his position of Chairman of the Board of Directors of Altisource Asset Management Corporation, and his position of Chairman of the Board of Directors of Home Loan Servicing Solutions Ltd. Mr. Erbey will have no directorial, management, oversight, consulting, or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders. In the event that Ocwen discovers a violation of the terms of this Paragraph, Ocwen will notify the Department of the violation within three (3) business days of discovery."

142. Ocwen's share price plummeted in response to these disclosures, falling 26.89% from its closing price of $21.90 on Friday, December 19, 2014, to close at $16.01 on Monday, December 22, 2014.

143. In response to this news, Sterne Agee analyst Henry J. Coffey, Jr. issued a report on December 22, 2014 stating that facts surrounding the Company's settlement with the NYDFS would likely "cripple profitability for some time."

**G. Post-Class Period Events**

144. After the close of trading on December 22, 2014, the Company hosted a conference call with analysts and investors to discuss the terms of the December 22, 2014 Consent Order (the "December 22, 2014 Conference Call"). During the December 22, 2014 Conference Call, Defendant Faris discussed several strategic shifts in Ocwen's core servicing business, including, among others: (i) selling the Company's agency MSRs in order to "focus [the] servicing business primarily on non-agency servicing[;]" (ii) expanding the Company's origination business; and (iii) executing on call rights to residential mortgage backed securities ("RMBS") that Ocwen owns as the servicer of approximately $200 billion in UPB on private-label mortgages.

145. In response to Defendant Faris's statements on the December 22, 2014 Conference Call outlining changes in the Company's business strategy, the *Wall Street Journal* reported the following day that, according to Guy Cecala, the publisher of *Inside Mortgage Finance*, "***Ocwen announced what amounted to a significant plan to downsize going forward***." The article further quoted Mr. Cecala in pertinent part: "The non-agency market is much, much smaller, so they are going to be a smaller company going forward. ***They have to rethink their whole business strategy***."

146. Also on December 23, 2013, Sterne Agee issued another report stating: ***"[t]he settlement with the NY Department of Financial Services (DFS) went well beyond anything we were expecting***. . . . We are reducing our price target from $23 to $14."

## VII. DEFENDANTS' SCIENTER WITH RESPECT TO THE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. Ocwen Has Agreed To Findings And Penalties By The New York Department Of Financial Services For Pervasive Non-Compliance During The Class Period

147. As set forth above, on December 22, 2014, Defendant Ocwen entered into a Consent Order with the NYDFS under New York Banking Law § 44 ("NYBL § 44"). Under NYBL § 44(d), the NYDFS is authorized by statute to require a registered mortgage servicer to pay a penalty for a violation of any order or written condition imposed by the Superintendent. Under the statute, any entity that has "has knowingly and willfully committed any violation" described in NYBL § 44 may be assessed a penalty exceeding $15,000 per day and not to exceed $75,000 per day.

148. Ocwen was assessed a penalty under by the NYDFS under NYBL § 44 for <u>knowing and willful violations</u> of the statute. Under the December 22, 2014 Consent Order, it paid a penalty of $100 million and separately provided restitution to New York State homeowners of $50 million for homeowners whose homes were foreclosed upon between Janaury 1, 2009 and December 22, 2014. The $100 million penalty for the violations during this period amounts to a fine of approximately **$45,000 per day**.

149. In addition to the $100 million penalty assessed against Ocwen for knowing and willful violations of the statute, the NYDFS stripped Defendant Erbey from his position as the Executive Chairman of Ocwen, and as the Chairman of Altisource, AAMC, RESI and HLSS. Pursuant to the consent order, Defendant Erbey is prohibited from having any "directorial, management, oversight, consulting or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation."

150. In explaining the extraordinary punitive action against Defendant Erbey, Superindendent Lawsky said the following at a speech delivered at Columbia University Law School on February 25, 2015:

> Corporations are made up of people. If there is wrongdoing at a corporation, that wrongdoing was committed by people.
>
> Of course, penalties imposed at the corporate level are often an important and necessary tool in our enforcement tool belt – particularly as it relates to organization-wide failures of oversight or compliance.
>
> But more and more often it feels like we are discussing a corporation's wrongdoing without detailing who exactly did what wrong.
>
> And, in my opinion, if in any particular instance we cannot find someone, some *person*, to hold accountable, that just means we have stopped looking.
>
> Moreover, even if there are certain circumstances where the misconduct does not rise to the level of criminal fraud, civil financial regulators can also play a role in imposing individual accountability.
>
> While NYDFS does not have authority to bring criminal prosecutions, it has taken a number of actions to expose and penalize misconduct by individual senior executives – including all the way up to the C-Suite, when appropriate.
>
> For example, NYDFS required the Chief Operating Officer of France's largest bank, BNP Paribas, and the Chairman of one of the United States' largest mortgage companies, Ocwen Financial, to step down as part of enforcement actions brought against those companies.

Superintendent's Remarks on Financial Regulation in New York City at Columbia Law School, (Feb. 25, 2015), available at http://www.dfs.ny.gov/about/speeches/sp150225.htm

151. In addition to the $100 million penalty and $50 million restitution to affected homeowners, and the termination of Defendant Erbey, Ocwen **stipulated and agreed** to the following facts grouped under two overarching findings: (1) "Inadequate And Ineffective Information Technology Systems and Personnel" and (2) "Widespread Conflicts of Interests with Related Parties." In the 2014 Consent Order, these findings are attributed to the work of the Compliance Monitor that the NYDFS appointed in accordance with the 2012 Consent Order Consent Order ¶¶ 9-10.

152. In the 2014 Consent Order, with respect to the first overarching finding, Ocwen and the DFS **stipulated and agreed** to the following facts, which confirm the materially false and misleading nature of Defendants' Class Period representations concerning the adequacy of Ocwen's information technology systems and its compliance with legal obligations:

- "In the course of its review, the Compliance Monitor determined that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."

- "For example, Ocwen's systems have been backdating letters for years. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure—and the cure date was months prior to receipt of the letter. Ocwen's proceses failed to identify and remedy those errors."

- "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance. Ocwen ignored the issue for five months until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery."

153. In addition, Ocwen and the DFS **stipulated and agreed** to the following additional facts relating the ability of Ocwen's servicing platform to comply with regulations set forth in the 2011 and 2012 DFS Consent Orders:

- "Ocwen's core servicing functions rely on its inadequate systems. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolios; each code initiates a process, such

as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes. Often, due to insufficient integregation following acquisition of other servicers, there are duplicate codes that perform the same function. The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

- "Ocwen's inadequate infrastructure and ineffective personnel ***have resulted in Ocwen's failure to fulfill its legal obligations***. Prior to the Department's and the Compliance Monitor's review, Ocwen ***did not take adequate steps*** to implement the reforms that it was legally obligated to implement pursuant to the 2011 Agreement."

154. The above facts concerning Ocwen's non-compliance and the inability of Ocwen's servicing platform to allow Ocwen to comply with its legal obligations, which Ocwen stipulated and agreed to in the 2014 NYDFS Consent Order, were known to Defendant Ocwen throughout the Class Period. Indeed, as discussed in detail below, various senior managers at Ocwen, and each of the Individual Defendants, were aware of these facts during the Class Period. These facts establish Defendants actual knowledge or reckless disregard of their Class Period statements set forth in Section IV above.

### 1. Ocwen's Employees Repeatedly Reported To Ocwen's Senior Compliance Officers The Deficiencies In Ocwen's Servicing Platform

155. In connection with Lead Plaintiff's independent investigation of the facts underlying its claims, numerous former Ocwen employees have established that the compliance failures identified in the 2014 Consent Order which rendered Defendants' Class Period statements materially misleading were known to Ocwen's senior officers during the Class Period rendering Ocwen's Class Period statements knowingly, or recklessly, misleading.

156. CW 1, who worked as a Supervisor within Ocwen's Internal Review Group between February 2013 and March 2014, oversaw the transfer of data associated with the

ResCap loans from the FiServ platform which ResCap used to service mortages, to REALServicing, the legacy platform that Ocwen sourced from Altisource. In particular, CW 1 was responsible for testing the REALServicing platform to ensure that loans were being serviced in compliance with applicable regulations. CW 1 noted that during the course of the data migration from FiServ to REALServicing, CW 1 and numerous other Ocwen employees repeatedly raised compliance-related complaints to Ed Watson, Ocwen's Vice President of the Internal Review Group who reported to S.P. Ravi, Ocwen's Chief Risk Officer, who in turn reported to Defendant Faris, concerning REALServicing and its ability to ensure compliance with Ocwen's regulatory obligations. As noted above, S.P. Ravi simultaneously, during this time, served as Altisource's Chief Risk Officer.

157. Specifically, CW 1 and other IRG personnel at Ocwen recorded the IRG's findings concerning the "pre-testing" of the ResCap loan data transferred from FiServ to REALServicing to ensure that this data would be transferred accurately and the subsequent live testing of this data for compliance with the NMS in weekly reports that were either in the form of an Excel-type spreadsheet or a PowerPoint presentation. In addition, CW1 and other IRG personnel identified compliance-related issues with REALServicing in these weekly reports. CW1's supervisor, Ed Watson, would disseminate these weekly reports concerning the pre-testing and live testing of the ResCap loan data and identifying the compliance-related issues with REALServicing via email to S.P. Ravi, who would then send these reports to Defendant Faris. Ravi also provided Faris daily and weekly updates regarding, among other things, the progress of the IRG's loan testing with respect to the ResCap portfolio to ensure that the loans were being transferred properly. Moreover, CW 1 participated in weekly conference calls with

Ravi that had been set up by the IRG Project Manager and addressed the compliance-related concerns that the IRG had identified with REALServicing.

158. Thus, the compliance deficiencies in Ocwen's servicing platform were made known to Ocwen's senior management in connection with the transition from FiServ to RealServicing. For example, CW1 revealed that while ResCap's FiServ platform required servicers to enter a single code into the servicing platform in order to open a new loan modification, REALServicing required the entry of up to ten different codes, which, according to CW 1 created significant compliance issues because there was no consistency among Ocwen departments as to how to apply such codes. Indeed, this is the very same problem to which Ocwen admitted in the 2014 NYDFS Consent Order, agreeing that its "patchwork of legacy systems" had an "unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

159. CW 1 further stated that the 2014 NYDFS Consent Order's description of Ocwen's servicing platform as a "patchwork of legacy systems" aptly and accurately described the REALServicing platform which Ocwen had, over time, attempted to conform to address its various acquisitions, According to CW 1 REALServicing lacked certain necessary compliance capabilities such as tracking, note taking, and the ability to efficiently search within the platform, unlike the FiServ platform which ResCap had previously used to service its loans and which was designed to be compliant with NMS Servicing Guidelines.

160. CW 1 also stated that REALServicing's coding issues led to force-placed insurance being improperly applied to certain condominium properties. In particular, when the mortgages for these properties were entered into REALServicing, they were coded incorrectly,

leading to the placement of force-placed insurance on the properties. CW 1 stated that this compliance deficiency became so severe that testing for this force-placed insurance metric was ultimately halted. The deficiency remained unresolved when CW 1 left Ocwen in March 2014.

161. CW 1 also stated that in REALServicing it was not possible to tell if late fees applied to a mortgage were carried over from the FiServ platform or if the borrower incurred the fees after Ocwen began servicing the loan. The only way for Ocwen employees to make such a determination was to compare REALServicing's records to those maintained in the FiServ platform.

162. CW 1's statements were corroborated by other former Ocwen employees whose experiences at Ocwen confirm the widespread knowledge of the lack of compliance of Ocwen's servicing platforms. For instance, CW 2 was responsible for ensuring that the ResCap loans purchased by Ocwen were in compliance with the National Mortgage Settlement and CFPB regulations. In particular, CW 2 was responsible for tracking mortgages subject to loss mitigation proceedings to ensure, among other things, that foreclosure proceedings were not initiated during the pendency of any loss mitigation efforts. Prior to the transition to REALServicing, CW 2 carried out these duties using the FiServ platform. According to CW 2, because the ResCap loans were subject to the National Mortgage Settlement, the FiServ platform had already been modified to ensure compliance with the National Mortgage Settlement and CFPB regulations. REALServicing, by contrast, was not prepared to ensure compliance with these requirements. Moreover, as later disclosed in the December 16, 2014 NMS Compliance Report, Ocwen informed the NMS Monitor following the conclusion of Test Period 7 on March 31, 2014 that the Company and the IRG "were having difficulty identifying and extracting valid loan testing populations" for one of the metrics used to evaluate Ocwen's compliance with the

NMS due to "[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ."

163. CW 2 attended a meeting in the spring of 2013 where his superiors, Joseph Pensabene and Gemma Camp, conveyed to CW 2 and others in attendance that Ocwen's management acknowledged that REALServicing was not as "friendly" and "looked a little more basic" than the FiServ platform. Pensabene expressed hope during this meeting that Ocwen would ultimately adopt the FiServ platform because REALServicing did not have the capabilities to ensure compliance with applicable regulations.

164. CW 2 agreed that REALServicing was "far from ready" to ensure compliance efficiently, and described the transition from the FiServ platform to REALServicing as "moving from a Mercedes to a Scion." In particular, CW 2 stated that the FiServ platform could handle a large volume of loans, whereas REALServicing could not, and that REALServicing required the entry of four or five codes to complete a single process. In fact, while the FiServ platform had approximately 100-150 codes that were used to service loans, REALServicing had about 2,000. Thus, the patchwork system of codes that violated the 2012 Consent Order and led to the 2014 Consent Order were known to Ocwen's senior management at least as of transition of ResCap's portfolio to Ocwen in April 2013. CW 2 further revealed that because REALServicing did not have codes necessary to track holds that were being placed on loans, many mortgages were on hold longer than they needed to be while others that should have been placed on hold were not. CW 2 expressed concerns regarding REALServicing to Gemma Camp.

165. CW 4, a Senior Compliance Analyst in Ocwen's Making Homes Affordable Compliance Group, identified similar deficiencies with Ocwen's compliance. In this role, CW 4 met with representatives from the United States Department of Treasury, which was

investigating compliance-related issues at the Company. In particular, CW 4 noted that in or around June 2012, Treasury representatives identified at least 25,000 Ocwen letters that were issued to rental property owners, which failed to mention that the rental properties qualified for home loan modifications. Ocwen failed to remediate the issue for approximately seven months.

166. Similarly, CW 4 stated that in the spring of 2013, following the Homeward acquisition, Homeward's compliance department discovered that certain borrower information had not migrated from Homeward's platform onto REALServicing. Ocwen had not remediated the problem as of August 2014, ***fifteen months*** after the problem was discovered. CW 4 further noted that because the problem had been identified internally by the Company, it was never reported to the Treasury. CW 4 asked his manager whether the issue should have been reported to the Treasury, and CW4's manager responded: "Heck no." Due to Ocwen's delays in remediating a number of compliance issues identified by Treasury representatives, Ocwen executive Scott Anderson was required to speak with Treasury examiners in Washington, D.C. on a monthly basis.

167. Despite receiving numerous complaints regarding REALServicing's inability to service loans in compliance with applicable regulations, and acknowledging that REALServicing was inferior to the FiServ platform, Ocwen management ultimately dismantled ResCap's FiServ platform in favor of REALServicing. CW 1 and CW 2 were informed that the decision was not made for compliance reasons, but instead to cut costs. In particular, even though REALServicing was unable to "support the functions" necessary to comply with Ocwen's regulatory requirements, Ocwen wanted to avoid incurring the $24 million a year necessary to operate the FiServ platform.

168. Ultimately, CW 2 resigned because REALServicing prevented CW 2 from doing CW 2's job adequately. As of December 2013 when CW 2 left the Company, REALServicing was not prepared to ensure compliance with applicable regulations.

169. Several other senior compliance employees who were responsible for compliance with respect to the ResCap and Homeward loan portfolios also departed, including the Chief Servicing Officer at ResCap, Joseph Pensabene, who left Ocwen in August 2013.

### 2. Ocwen's Senior Managers Knew That The Backdating Of Loan Modification Letters Was A Problem As Early As November 2013

170. As noted above, Ocwen has agreed to findings in the 2014 Consent Order that its inadequate servicing infrastructure caused it to backdate thousands of loan modification letters "for years." 2014 NYDFS Consent Order at ¶15.

171. This backdating problem was a direct violation of Ocwen's obligations under the 2012 Consent Order and the CFPB servicing guidelines. As discussed above, within ten days of Ocwen denying a homeowner's loan modification request, it was required under its agreements with the CFPB and NYDFS to "notify borrowers of the final denial of any first lien loan modification request within 10 business days of the denial decision." In this "written non-approval notice," Ocwen was required to identify the reasons for the denial and inform the borrower that he or she had 30 days to appeal the decision. Yet, because of Ocwen's backdating practice, the denial letter sent by Ocwen "was dated more than 30 days prior to the date that Ocwen mailed the letter." As a result, by the time the homeowner received Ocwen's denial letter, the mandatory thirty-day appeal period had already expired.

172. Similarly, Ocwen issued letters to homeowners facing foreclosure that included a date by which to cure their default and avoid foreclosure, but the cure dates listed in many

Ocwen letters expired before homeowners ever received the letter from Ocwen. According to news reports, Ocwen had been backdating homeowner letters since 2010.

173. On June 19, 2014, the DFS Monitor identified the backdating issue when it was brought to his attention by an Ocwen whistleblower.

174. After demanding an explanation from Ocwen, Ocwen informed the Monitor that the problem affected 6,100 letters, that Ocwen discovered the issue in April or May of 2014 (just one or two months before the Monitor uncovered the problem), and that Ocwen changed its systems in May 2014 to resolve the problem.

175. Yet, when the Monitor undertook its own investigation, it determined, after just a few days, that there were nearly 1,000 backdated letters in addition to the 6,100 identified by Ocwen. In addition, while Ocwen subsequently admitted that an employee had informed senior management of the issue in November 2013, including the Company's Vice President of Compliance, Ben Purser. Yet upon learning about the serious backdating issue in November 2013, Ocwen and Purser, did nothing – the Company did not inform its regulators, borrowers, investors or any other interested parties that it had wrongly backdated borrower communications that affected, in the NYDFS's estimation, "potentially hundreds of thousands of letters to borrowers," nor did it undertake any efforts to remediate the issue.

176. After five months of inaction, the same employee raised the backdating issue with senior management in April 2014. Again, Ocwen failed to notify its regulators, homeowners, investors or any other interested parties of this issue, nor did it undertake any investigation into the cause or scope of the backdating problem. Instead, it continued to represent to investors that Ocwen was in full compliance with its regulatory obligations. According to CW 1, it was not until the employee blew the whistle on Ocwen's backdating violations by informing the Monitor,

did the backdating issue come to light. At that point, according to CW 1, federal agents raided Ocwen's offices and confiscated the laptops of all managers of IRG, including Hillary Freeburg, a director of quality assurance at Ocwen, and Ed Watson, Vice President of IRG.

177. According to the NMS Monitor, Ocwen admitted that its practice of backdating of homeowner communications was facilitated by the Company's use of the REALServicing platform "because FiServ letters are processed differently and do not use the trigger date as the date of the letters."

178. CW 1 confirmed that the timely dissemination of communications to homeowners was "a big problem" at Ocwen during the Class Period. CW 1 was aware of many problems at Ocwen that caused borrowers to receive letters with an improper date, and also noted that Ocwen had difficulty getting letters to borrowers on a timely basis. CW 1 stated that this problem was attributable in part, to Ocwen's use of the REALServicing platform.

179. Similarly, CW 3, who worked as a Relationship Manager in Ocwen's Home Retention Department between January 2012 and February 2014, confirmed that while employed at the Company, homeowners complained about receiving denial letters "too late." According to CW 3, Ocwen actually convened a meeting to discuss delays in mailing borrower communications. CW 3 also noted that the issue of correspondence delays was referenced in the Company's newsletter.

**3. The Dual Roles of Employees At Ocwen And Altisource Violated Regulatory Requirements**

180. The NMS required the IRG to be independent. Yet, in reckless disregard of this requirement, Ocwen had appointed as the IRG supervisor S.P. Ravi, who was simultaneously serving as Altisource's Chief Risk Officer. This was a clear conflict of interest in blatant disregard of the independence standards for the IRG. Furthermore, Ravi was not the only Ocwen

executive who was also employed by Altisource that occupied a senior compliance function. CW 4, a Senior Compliance Analyst at Ocwen from January 2012 to September 2014, identified numerous individuals, including a Director of Quality Assurance, a Senior Vice President of Risk Management, and a Senior Manager at Ocwen, who were also employed by Altisource during the Class Period. CW 4 stated that, internally, Ocwen and Altisource employees were treated as if they worked for the same company because regardless of which company you worked for, "you worked for Bill Erbey, bottom line." In fact, CW 4 recalled that at one point during the Class Period the Director of Quality Assurance was uncertain as to whether he was employed by Ocwen or Altisource. Ocwen, through Defendants Erbey and Faris, and other senior executives like Ravi, knew and/or recklessly disregarded that these conflicts of interest were a clear violation of Ocwen's regulatory obligations, thereby serving as another example of the falsity of their public statements regarding compliance with such obligations.

181. As noted by the NYDFS in the February 26, 2014 Letter, these employees' dual roles at Ocwen and Altisource "raise[] the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's shareholders as a result."

### B. Ocwen Knew Or Recklessly Disregarded That Its Public Statements Concerning Controls Over Related Party Transactions Were False And Misleading

#### 1. Ocwen's Lack Of Controls Over Related-Party Transactions Exacerbated Its Severe Compliance Deficiencies

182. Contrary to Defendants' public representations concerning the "market rates" Ocwen ensured homeowners when dealing with its affiliates, these homeowners paid above-market fees for services provided by Hubzu, which is owned by Altisource. During the course of

its investigation into Ocwen, the DFS Monitor uncovered that while Ocwen used Altisource's Hubzu portal as its principal online auction site for the sale of both homes facing foreclosure and investor-owned properties following foreclosure, Hubzu charged Ocwen-serviced properties an above-market auction fee of 4.5% for listing on its website. This fee was ***up to three times*** the fees Hubzu charged to non-Ocwen customers. As revealed by the NYDFS in the April 21, 2014 Letter:

> In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%. These higher fees, of course, ultimately get passed onto the investors and struggling borrowers who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

183. In response to this letter, Defendant Erbey, wearing his cap as Altisource's Chairman, participated on an Altisource investor call on April 24, 2014, where Altisource addressed the NYDFS Letter and Hubzu's rates. William Shepro, an Altisource executive, said the following:

> Earlier this week, Ocwen received a letter from the New York Department of Financial Services with inquiries primarily relating to Hubzu. We firmly believe that Altisource's asset management business provides a very transparent and efficient method to sell real estate, that the fees we charge are in line with or lower than industry standards and that we generate strong results for homeowners.
>
> * * *
>
> As we said in my prepared remarks, Mike, Hubzu's beginning to win some new institutional clients beyond Ocwen, those are the 7 agreements we've signed with other servicers and asset managers where they are going to use Hubzu to sell their assets. We're also in active negotiations with 4 other clients. We charge at 4.5%. We typically charge a 4.5% buyers premium, which is lower than the 5% market standard. And we believe it's our results that's helping us gain traction with new customers. We have about 50 institutional houses on Hubzu, where there's a 3.5% buyers premium. And we expect by the end of our next auction cycle that all of the institutional homes on Hubzu will be listed with the 4.5% buyers premium. And we're spending — Mike, this answers the second part of your question. We're spending millions of dollars to drive traffic to the homes marketed on Hubzu in order to create more value for the investors. And then with respect to

> our nondistressed or noninstitutional program, what we're calling is our preferred partner program. Here, we're trying to establish an online marketplace for individual homeowners and their brokers to auction homes and to move the home sales transaction from an offline environment to an online environment. So unlike the mature REO auction space, individual homeowners and their brokers typically don't sell homes through auction today. We're charging a lower buyers premium here of 1.5%, but we're also doing less work.

Altisource Form 8-K filed with the SEC, April 24, 2014. The Monitor further uncovered that "the underlying HTML code" for Hubzu's website actually queries whether Ocwen is the seller of the property being listed on Hubzu. For those properties where Ocwen was the seller, the NYDFS concluded that the auction fees paid to Hubzu were higher.

184. Under Ocwen's conduct in this regard violated regulatory requirements, specifically the NMS guidelines requiring that:

> Servicer shall not collect any fee for default, foreclosure or bankruptcy-related servicers by an affiliate unless the amount of the fee does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, and (b) the market rate for the service. To determine the market rate, Servicer shall obtain annual market reviews of its affiliates' pricing for such default and foreclosure-related servicers; such market reviews shall be performed by a qualified, objective, independent third-party professional using procedures and standards generally accepted in the industry to yield accurate and reliable results. The independent third-party professional shall determine in its market survey the price actually charged by third-party affiliates and by independent third party vendors.

185. Thus, notwithstanding Altisource's defense of its pricing practices for Ocwen, Ocwen's acceptance of these practices did not conform with Ocwen's obligations to retain an independent third-party to evaluate "market rates" in the 2014 NYDFS Consent Order, Ocwen agreed and stipulated to the fact "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

### 2. Ocwen Knowingly And Recklessly Misled Investors About Its Related Party Policies

186. Ocwen's agreement to pay inflated listing rates to Hubzu, and thus Altisource, contradicted Defendants' public commitment to paying "market rates" to the Erbey related companies, and resulted in excess money being transferred from Ocwen homeowners and investors to Altisource and, ultimately, Defendant Erbey. Ocwen and Defendant Erbey clearly knew about the terms under which Hubzu listed Ocwen's homes and the prices charged for these services.

187. In 2014 NYDFS Consent Order, Ocwen stipulated and agreed that Defendant Erbey "has participated in the approval **of a number of transactions** between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014." Moreover, in the 2014 NYDFS Consent Order, Ocwen stipulated and agreed that Ocwen "does not have a written policy that explicitly requires potentially conflicted employees, officers or directors to recuse themselves from involvement in transactions with the related parties."

188. Thus, contrary to Ocwen and Erbey's repeated Class Period statements that Erbey recused himself from decisions related to **all** related party transactions, he did not. Plainly, Defendant Erbey along with Ocwen's other directors were aware of this fact and that Ocwen's repeated public statements were materially misleading.

189. One example of a highly material related party transaction that the 2014 NYDFS Consent Order highlights as a related party transaction that Defendant Erbey admitted approving was an agreement between Ocwen and a third-party insurance agent, SWBC, which had the effect of funneling over $65 million in annual fees from Ocwen to Altisource "for doing very little work."

190. This transaction was particularly egregious because it circumvented specific regulatory requirements imposed by both the NYDFS and the NMS that targeted the use of affiliates to purchase forced-placed insurance for struggling homeowners at inflated costs.

191. In connection with its acquisition of ResCap in December 2012, Ocwen acquired a ResCap operating company called Beltline Road Insurance Agency, Inc. ("Beltline"). In August 2013, Ocwen sold Beltline along with other ResCap assets that were purportedly not in line with its existing business to Altisource. Immediately thereafter, Altisource hired Beltline as its exclusive insurance agent for which it would be paid a fee for, among other things, forced placed insurance for Ocwen's homeowners. In particular, Beltline was tasked with finding an insurance company to provide Ocwen with force-placed insurance, as its existing force-placed arrangement with Assurant was set to expire in March 2014.

192. In January 2014, Altisource recommended that Ocwen use SWBC as its "managing general agent" to oversee the Company's force-placed insurance program and to negotiate premiums with other insurance companies. Altisource then recommended itself to provide certain fee-based services to SWBC in connection with this arrangement.

193. Altisource's proposal was presented to the Credit Committee of Ocwen Mortgage, Servicing, Inc., which consisted of Richard Cooperstein, Duo Zhang and Defendant Erbey. Neither Cooperstein nor Zhang are members of the Ocwen Board of Directors, and the transaction was not presented to any member of Ocwen's Board of Directors other than Defendant Erbey.

194. Through e-mails dated January 15 and 16, 2014, Cooperstein, Zhang and Defendant Erbey approved of this related-party arrangement. Based on Defendant Erbey's approval and without any further consideration by other Ocwen directors or executives, Ocwen

executed contracts formalizing this force-placed arrangement on June 1, 2014. The NYDFS concluded from its review of internal Ocwen documentation related to this transaction in the August 4, 2014 Letter that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."

195. Thus, not only did Defendant Erbey participate in the negotiation and approval of this related-party transaction, but also, in fact, he was the only member of Ocwen's Board of Directors to approve of the arrangement. Defendant Erbey's role in negotiating and approving this transaction directly contradicts Defendants' representations to investors that Defendant Erbey recused himself from all negotiations and transactions with related parties like Altisource.

196. This related-party transaction led to tens of millions of dollars being funneled from Ocwen to Altisource in exchange for "very little work." In particular, Ocwen agreed to give all of its force-placed business to SWBC, and in exchange SWBC agreed to pass on "15% of net written premiums on the policies" to Beltline, an Altisource subsidiary. These fees, which were for "insurance placement services," amounted to roughly $60 million per year for Altisource. The NYDFS was unable to identify any actual "insurance placement services, if any, Altisource is providing to justify these commissions."

197. Ocwen also agreed to pay an annual "technology support fee" to SWBC in the amount of 20 cents per loan per month – double the fee that Ocwen paid to Assurant, a non-related party, to provide similar services prior to 2014. SWBC, in turn, passed on 75% of this fee, or 15 cents per loan per month, to Altisource – an amount estimated to total $5 million per year – in exchange for access to Ocwen's loan files. However, Altisource's contractual arrangements with Ocwen already required it to provide such access to third parties designated

by Ocwen, meaning that this arrangement resulted in Altisource receiving a $5 million annual income stream for services that it was "already obligated to provide."

198. In sum, Ocwen's arrangement with SWBC was designed to funnel nearly $65 million in annual fees to Altisource, a figure that amounts to 50% of Altisource's net income for the entire fiscal year of 2013. These fees appear to represent pure profit to Altisource, as it does not appear that Altisource was required to provide any discernible services to Ocwen or SWBC (beyond those services it was already obligated to provide) in exchange for them.

199. Moreover, in the October 5, 2015 SEC Release, the SEC identified additional examples of Erbey's failure to recuse himiself from related party transactions. In particular, as discussed above, the SEC found that Erbey—in his capacity as Chairman of both Ocwen and HLSS, approved numerous transactions involving the sale of rights to MSRs from Ocwen to HLSS.

200. Further, the SEC uncovered a February 2014 email from Erbey to senior management at both HLSS and Ocwen, wherein Erbey approved Ocwen's sale of $672 million in delinquent loans to HLSS on the condition that it did not trigger any losses for HLSS. SEC Release ¶ 21.

**C. Direct Evidence Of Defendant Erbey's Scienter**

201. Defendant Erbey's conduct throughout the Class Period was directly at odds with his and Ocwen's public statements concerning purported controls Ocwen had instituted to screen Erbey from decisions concerning business placed with other Erbey Companies. First, Defendant Erbey personally approved of Ocwen's force-placed arrangement with Altisource and SWBC. Additionally, the NYDFS disclosed in the August 4, 2014 Letter that this was not an isolated breach of Mr. Erbey's public statements to investors but instead had "uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies."

Defendant Erbey's conduct in this regard directly contravenes Defendants' public statements during the Class Period that he recuses himself from related-party transactions, and thus raises a strong inference of scienter.

202. In addition to directly conflicting with public representations to the contrary made to the investing public, Defendant Erbey's direct participation in steering business to his related companies was detrimental to homeowners and concealed the risk from investors of regulatory enforcement of which Defendant Erbey was acutely aware. Indeed, he acknowledged that Ocwen's regulators were troubled with the Company's relationships with entities that he controlled and which had adverse goals to keeping homeowners in their homes. For example, during the February 27, 2014 Conference Call, Defendant Erbey noted that "[w]e received a letter yesterday from the [NY] DFS asking about our relationships with four related companies, independent companies. . . . We look forward to addressing the matters raised by DFS and will fully cooperate."

203. A key example of Defendant Erbey's direct involvement with related-party transactions that were adverse to the interests of homeowners and were precisely the transactions from which he was supposedly recusing himself is the force-placed insurance arrangement he approved involving Ocwen, SWBC and Altisource. That deal, which Defendant Erbey approved in January 2014, called for the payment of a "technology support fee" to SWBC – 75% of which flowed through to Altisource – that was double what Ocwen had paid to another insurer for similar services the prior year. In fact, based on its review of documents related to the transaction, the NYDFS concluded that it was negotiated and approved by Defendant Erbey "with the expectation and intent that Altisource would use this opportunity to steer profits to itself." In particular, according to the NYDFS, "this complex arrangement appears ***designed to***

***funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work***." As such, it raised serious concerns that Ocwen was attempting to circumvent prohibitions on kickbacks to mortgage servicers that the NYDFS had imposed the previous year in light of its investigation into similar arrangements involving higher commissions being kicked back by insurers to mortgage servicers' affiliated insurance agencies as a quid pro quo for purchasing force-placed insurance with higher premiums, "***[t]he extra expense of [which], in turn, can push already struggling families over the foreclosure cliff***." Moreover, the NYDFS determined that Defendant Erbey's central role in its approval was "inconsistent with public statements Ocwen has made, as well as representations in company SEC filings" regarding Defendant Erbey's purported practice of recusing himself from decisions involving related companies. These facts constitute further evidence of Defendant Erbey's scienter.

204. Second, it was widely known within senior levels at Ocwen that its platform – sourced by Altisource – was inadequate to ensure compliance with the NMS. According to the CW's indentified above, numerous compliance professionals complained vociferously about the compliance issues created by Altisource's platform, REALServicing. According to CW 1, Defendant Faris received daily and weekly updates from Ocwen's Chief Risk Officer, S.P. Ravi, identifying the severe compliance-related deficiencies within the REALServicing platform. These reports were prepared by Ocwen's IRG, the group responsible for ensuring compliance of ResCap loans with NMS standards. According to CW 1, Joseph Pensabene, an Executive Vice President at Ocwen who had served as the Chief Servicing Officer at ResCap, informed CW 1 and other compliance professionals that Ocwen would be transitioning to Altisource's platform because it was cheaper.

205. Defendant Erbey made specific references to Ocwen's compliant servicing platform in his public statements and which reflects, at a minimum, a reckless disregard for the truth of his statements. Indeed, during the February 27, 2014 Conference Call, he volunteered in comments addressing the NYDFS's hold on the Wells Fargo transaction and queries concerning Ocwen's related-party transactions, "We've also invested in and will continue to invest in more robust auditing, quality control and validation of our servicing, quality and compliance." Defendant Faris repeated this representation on the call:

> As we look forward to this year, we expect to maintain strong operating performance by investing in our compliance management infrastructure that will enhance our ability to demonstrate our compliance, raising the bar on customer service through continued investments in training, new processes and new technologies, improving our cost structure by consolidating onto a single operating platform and taking advantage of our scale to further reduce overhead expenses and building our lending business and utilizing our core competencies to invest in adjacent businesses.

206. As part of the 2014 NYDFS Consent Order, Defendant Erbey agreed to resign from his position as the Executive Chairman of Ocwen, and as the Chairman of Altisource, AAMC, RESI and HLSS. Pursuant to the consent order, Defendant Erbey is prohibited from having any "directorial, management, oversight, consulting or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation." In addition, the NYDFS required that Ocwen executives and directors "not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders."

**D. Defendant Erbey's Financial Motivation To Conceal Facts From Investors**

207. As discussed herein, while Defendant Erbey owned 13% of Ocwen's common stock as of December 31, 2013, he owned double that amount – 26% – of Altisource's common

stock as of the same date. This meant that Defendant Erbey took home $0.26 for every dollar earned by Altisource, but only $0.13 for every dollar earned by Ocwen.

208. As the NYDFS recognized in the August 4, 2014 Letter concerning Defendant Erbey's approval of a related-party transactions, Defendant Erbey's larger ownership stake in Altisource and Altisource's lower effective tax rate ensured that Defendant Erbey profited personally every time Ocwen diverted revenues to Altisource.

209. Defendant Erbey's interests in Altisource provided him with a clear motive to participate in related-party negotiations in contravention of Defendants' public statements to investors. For instance, by approving Ocwen's force-placed arrangement with SWBC and Altisource, Defendant Erbey ensured that Altisource would earn approximately $65 million in annual revenues without providing any meaningful services to Ocwen or SWBC. Defendant Erbey's share of those revenues amounts to approximately $16.9 million annually. Neither Altisource nor Erbey would have earned these funds if Ocwen had not entered into this arrangement with SWBC.

210. Likewise, Defendant Erbey's stake in Altisource meant that he also profited from Ocwen's decision to force its borrowers to pay 4.5% in fees to list on Hubzu, as opposed to the 1.5% fee Hubzu charged non-Ocwen borrowers. Each time an Ocwen borrower paid that additional 3% over and above Hubzu's market rates, Defendant Erbey stood to earn 26% of that amount. Moreover, Ocwen's decision to rely exclusively on Altisource's servicing platform despite widespread criticisms concerning its inability to handle the compliance needs associated with the volume of loans that Ocwen had acquired, benefited Defendant Erbey personally.

211. Finally, Defendant Erbey personally profited every time a backdated letter caused an Ocwen-serviced property to enter foreclosure. As alleged herein, once foreclosure

proceedings began on an Ocwen-serviced loan, Ocwen engaged Altisource to provide various foreclosure-related services including, *inter alia*, valuation services and property preservation services, thereby increasing Altisource's revenues. In addition, once Ocwen foreclosed on a property, it had the option either to transfer the property to Hubzu for sale (thereby causing Defendant Erbey's stake in Altisource to increase in value once again) or to RESI for rental (thereby causing Defendant Erbey's stake in AAMC/RESI to increase in value).

212. In sum, Defendant Erbey's financial interest in each of the Ocwen-related entities, and the fact that each of the improper transactions alleged herein had the effect of transferring assets out of Ocwen and into an Ocwen-related entity in which Defendant Erbey had a large financial interest, constitutes strong circumstantial evidence of his scienter.

**E. Defendant Erbey's And Defendant Faris's Positions Within Ocwen And The Erbey Companies Raise A Strong Inference Of Their Scienter**

213. As alleged herein, Defendant Erbey was the Executive Chairman of Ocwen and Defendant Faris served as its CEO throughout the Class Period. According to the 2014 Proxy: "As our President and Chief Executive Officer, Mr. Faris is responsible for our day-to-day operations and for formulating and executing our long-term strategies in collaboration with the Board of Directors." The 2014 Proxy goes on to state: "As Executive Chairman of the Board, Mr. Erbey leads the Board of Directors and oversees Board meetings and the delivery of information necessary for the Board's informed decision-making. In addition to leading the Board of Directors, Mr. Erbey is actively involved in our business and focuses on strategy, key personnel development and corporate finance."

214. In addition, the 2014 Proxy notes:

> The Board of Directors' role in risk oversight is consistent with the Company's leadership structure with the President and Chief Executive Officer and other members of senior management having responsibility for assessing and managing

the Company's risk exposure, and the Executive Chairman, the Board of Directors and its Committees providing oversight in connection with these efforts.

215. The 2014 Proxy also states that Defendant Faris has "an intimate knowledge of [Ocwen's] business and plays an active role in the day-to-day management of [its] operations."

216. Given Defendant Faris's and Defendant Erbey's intimate involvement in the management and oversight of the Company, and in particular its risk exposures, it is simply inconceivable that they were not aware of the fact that S.P. Ravi and other Ocwen managers were was simultaneously employed by Altisource, or the conflicts of interest inherent in these dual roles. This is particularly true for Defendant Erbey, who served as the Chairman of both Ocwen and Altisource.

217. Moreover, Defendant Erbey's role as Chairman of Altisource constitutes additional circumstantial evidence of his scienter with respect to Ocwen's force-placed insurance arrangement with Altisource and SWBC, which resulted in Altisource earning approximately $65 million in fees annually. Those fees were plainly material to Altisource's financial condition, as it represents nearly 8.5% of Altisource's total revenue and 48.6% of Altisource's net income for the entire fiscal year of 2013. The magnitude of this arrangement with Ocwen constitutes strong circumstantial evidence that, as the Chairman of Altisource's Board of Directors, Defendant Erbey was aware of this arrangement and/or recklessly disregarded the fact that Altisource was earning above-market fees in exchange for little-to-no work.

218. Additionally, Defendant Erbey's dual role as Chairman of both Ocwen and Altisource raises a strong inference of his awareness that the 4.5% fee Ocwen was paying to Hubzu was materially larger than the 1.5% fee that Hubzu charged its non-Ocwen businesses. In fact, as set forth in the April 21, 2014 Letter, the NYDFS discovered that "the underlying HTML code for the Hubzu website appears to include a built-in notation stating 'isOcwenSeller' –

followed by a 'Y' or 'N' for each individual property" and that higher rates were charged "[f]or those properties where a 'Y' is noted."

219. Similarly, Defendant Erbey's dual role as the Chairman of both Ocwen and Altisource raises a strong inference of his awareness that Altisource was receiving $65 million in compensation in exchange for little to no work under Ocwen's force-placed insurance arrangement with SWBC, and that the "technology support fee" paid by Ocwen was double the rate that it had paid to another company for similar services during the prior year.

220. Further, during the Class Period Defendant Faris served on the Ocwen Board's Compliance Committee, which "provides assistance to the Board of Directors with (i) establishment and oversight of our compliance function, including our compliance management system, and (ii) oversight of our compliance with applicable laws, rules and regulations governing its consumer-oriented businesses including Federal consumer financial laws and applicable state laws." Defendant Faris's role as a member of the Compliance Committee, which required him to oversee the Company's compliance with legal and regulatory requirements, constitutes strong circumstantial evidence of his awareness, or reckless disregard of, *inter alia*: (i) the severe compliance-related deficiencies associated with Ocwen's REALServicing platform, its resulting inability to satisfy Ocwen's regulatory obligations throughout the Class Period and the increased costs necessary to satisfy such allegations; and (ii) Ocwen's consistent failure to comply with applicable regulations throughout the Class Period by, among other things, backdating borrower communications. This is particularly true in connection with Ocwen's admission that its Vice President of Compliance was informed of, and ignored, the backdating scandal in November 2013 and again in April 2014.

### F. The Magnitude Of The Backdating Scandal

221. As alleged above, the backdating scandal at Ocwen spanned nearly four years and affected "potentially hundreds of thousands" of borrowers. The enormous breadth of this improper practice, which directly contravened the terms of the NMS, as well as Ocwen's agreements with the CFPB and the NYDFS, constitutes additional circumstantial evidence that Defendants were aware of or recklessly disregarded the backdating problem, and the fact that it rendered their Class Period statements to investors materially false and misleading.

## VIII. LOSS CAUSATION

222. Defendants' unlawful conduct alleged herein directly and proximately caused the foreseeable losses suffered by Lead Plaintiff and the Class. The material false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. These materially false and misleading statements and omissions regarding, *inter alia*, Ocwen's controls over related-party transactions and its compliance with applicable mortgage servicing rules and regulations caused the Company's common stock to trade at artificially-inflated prices throughout the Class Period.

223. As the true facts became known, the price of Ocwen common stock declined, causing damage to Lead Plaintiff and the Class. Specifically, through a series of partial disclosures between February and December 2014, the market learned that, contrary to Ocwen's public representations, Defendant Erbey had not recused himself from all related-party transactions, the Company was not entering into related-party transactions at market rates, the Company's mortgage servicing practices were not in compliance with its obligations under the various consent agreements it had entered into with its regulators, the cost of compliance with these regulations reduced any purported competitive advantage, and Ocwen would be unable to

acquire more loans because of its inability to assure its regulators that it could comply with regulatory mandates.

224. Each of the corrective disclosures discussed herein partially revealed the truth regarding Ocwen's false representations concerning its improper mortgage servicing practices, related-party transactions, and true costs of servicing its loans using its existing servicing platform. However, the full truth regarding Defendants' misstatements and omissions was not revealed to the market until December 22, 2014, when the market finally appreciated the full scope of Defendants' improper servicing practices and related-party transactions, the true extent of Defendant Erbey's wrongful conduct, and the full impact of such wrongful conduct on the Company's financial condition.

225. On February 6, 2014, Ocwen disclosed that the NYDFS had placed "an indefinite hold" on its agreement to purchase of $39 billion in MSRs from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth." Ocwen responded to the market that it "will continue to work closely with the NYDFS to resolve its concerns about Ocwen's servicing portfolio growth." The NYDFS's halt to the Wells Fargo transaction revealed that despite Ocwen's representations to the market that it was in full compliance with NYDFS requirements and thus poised for continued growth, the NYDFS had identified ongoing compliance problems at Ocwen.

226. Ocwen's share price declined $1.82 in response to this news, from a close of $43.20 on February 5, 2014 to $41.38 on February 6, 2014. As *The New York Times* reported on February 7, 2014, "[a] move to delay the Wells Fargo transaction, which was announced two weeks ago, or future transactions could complicate Ocwen's strategy of increasing its revenue by acquiring more servicing rights from the big banks."

227. On February 26, 2014, the compliance problems suggested by the NYDFS's February 6, 2014 hold on the Wells Fargo transaction were revealed in a public letter accusing Ocwen of "potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated," and exposing S.P. Ravi's dual role as CRO of both Ocwen and Altisource. Superintendent Lawsky wrote that these relationships, "raise[] the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result." S.P. Ravi's conflicted role, in the Superintendent's view, "cast serious doubt[]" on Ocwen's public statements that it had a strict arm's-length relationship with affiliated companies.

228. Ocwen's share price declined $2.76 per share in response to this news, or nearly 7%, from a close of $39.52 on February 25, 2014 to close at $36.76 per share on February 26, 2014. As set forth above, Ocwen responded to the February 26, 2014 Letter by issuing additional false and misleading statements affirming that its related-party agreements "are fully disclosed in our public filings, and we believe them to be on an arms-length basis."

229. Ocwen's reassurances that its relationships with related parties were fully disclosed and on an arm's-length basis were undermined – as was investor confidence – on April 21, 2014, when the NYDFS issued another letter to Ocwen. In the April 21, 2014 Letter, the NYDFS publicly disclosed its Monitor's finding that Ocwen borrowers were being charged inflated rates for the sale of homes facing foreclosure by Altisource's Hubzu portal:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-

> serviced properties are being funneled into an uncompetitive platform at inflated costs.

230. Ocwen's share price declined an additional $0.95 in response to this news, from a close of $39.01 on April 17, 2014, to $38.06 on April 21, 2014—the next trading day following the Easter holiday weekend. The April 21, 2014 Letter further called into question Ocwen's ability to satisfy NYDFS's concerns about its related-party transactions and whether such transactions were, as Ocwen had represented to its shareholders, at arm's-length and at "market rates." The April 21, 2014 Letter disclosed for the first time evidence that Ocwen was not charging market rates to homeowners for services obtained through related companies, thereby exacerbating Ocwen's regulatory risk.

231. On May 1, 2014, Ocwen announced its 1Q 2014 earnings, disclosing for the first time that regulatory demands had increased its costs for servicing non-conforming loans and these costs were eating into servicing margins. During the call, Defendant Faris stated,

> [W]e estimate that industry average variable costs for servicing nonperforming loans have risen by approximately $50 to $60 per year. We would estimate our own variable costs have gone up by about $30 to $40 per year per nonperforming loan . . . no doubt that the impact of all of this has been to erode margins in the short run. Longer term we believe this strengthens Ocwen's competitive advantage because the changes increase the importance of scale and efficiency…

Defendant Erbey further noted during the May 1, 2014 Conference Call that "Ocwen is the only non-bank servicer to be subject to its own National Mortgage Settlement that applies across the entire servicing portfolio," and identified Ocwen's "National Mortgage Settlement compliance" as another competitive advantage. Thus, while disclosing increasing costs in the short term for regulatory compliance, Ocwen claimed that it had a competitive advantage because it was better suited than its competitors to efficiently comply with regulatory requirements on its existing platform. Ocwen's shares responded to the 1Q 2014 earnings release by falling 7.4%.

232. That Ocwen was well poised to meet its compliance requirements and continue its growth was suggested by Defendant Faris in an investor conference on June 4, 2014, hosted by Keefe, Bruyette & Woods, a research firm. At the conference, as reported publicly by numerous media outlets, Defendant Faris expressed optimism that the Wells Fargo deal would proceed. Compass Point analyst Kevin Barker relayed in a report, "In the first quarter they specifically did not talk about a pipeline at all and to include the Wells Fargo deal in that may signal that they believe the deal's going to go through, or it may happen eventually." Ed Groshans, analyst with Height Analytics reported that the Wells Fargo deal was confirmed, and this showed that Ocwen "is willing and capable of addressing the concerns" raised by the NYDFS. "This supports our view that the two parties can reach an accord, which will permit the Wells Fargo transaction to proceed," wrote Goshans.

233. On July 31, 2014, however, the reassuring statements that followed the 1Q 2014 earnings release were met with a dramatic disclosure of how Ocwen's lack of regulatory compliance was severely impacting its financial condition. Specifically, Ocwen disclosed that during the second quarter of 2014, it incurred "roughly $12 million of expenses for the New York states [sic] and national monitors," that it "expect[ed] to incur roughly 9 million dollars in the third quarter[] [in] ongoing monitoring costs," and that such costs "are a significant element of [Ocwen's] cost base." This disclosure revealed for the first time that Ocwen's compliance costs were dramatically higher than Defendants had previously represented, and that, contrary to Defendants' prior statements, Ocwen was unable to service loans in full compliance with its regulatory obligations at the 70% discount it disclosed to investors during the Class Period.

234. The Company's share price declined $4.49 per share in response to this news, from $34.66 on July 30, 2014 to $30.17 on July 31, 2014. This decline eliminated more than $600 million in market capitalization.

235. On August 4, 2014, the NYDFS disclosed additional improper related-party transactions at Ocwen, this time revealing evidence indicating that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself." According to the NYDFS, "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."

236. In response to this latest revelation from the NYDFS, Ocwen's share price fell an additional $0.70 per share, from a close of $27.68 on August 1, 2014 to close at $26.98 on August 4, 2014.

237. On October 21, 2014, the NYDFS shocked the market by disclosing that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of thousands" of borrowers, in violation of the Company's legal and regulatory obligations:

> Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings. Ocwen is not meeting those obligations. And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance.

238. The NYDFS concluded:

> The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.

239. Before the markets closed on October 21, 2014, Ocwen issued the October 21, 2014 Press Release, in which it indicated that the backdating was "inadvertent," affected only 283 borrowers in New York, and had been fully resolved. Nevertheless, in response to these shocking revelations, the Company's share price declined by $4.78 per share, or 18.2%, from a close of $26.26 on October 20, 2014 to close at $21.48 on October 21, 2014.

240. After the markets closed on October 21, 2014, Ocwen revealed that October 21, 2014 Press Release contained inaccurate information. In fact, contrary to its representation that backdating affected only 283 borrowers, Ocwen subsequently disclosed that it was "aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were." In response to this news, the Company's share price declined an additional $2.44, or 11.36%, from its close of $21.48 on October 21, 2014 to close at $19.04 on October 22, 2014.

241. As the market realized, Ocwen's massive backdating problem was the death-knell for the Wells Fargo deal, and likely end to Ocwen's ability to purchase any further MSRs in the near future. In response to these revelations, Compass Point analyst Kevin Barker issued a Flash Note the same day noting that Ocwen's backdating issue "increases the chances the Wells Fargo servicing deal is cancelled" and could cause the Company's shares to trade closer to its tangible book value of $18 per share.

242. Likewise, Arren Cyganovich of Evercore Partners downgraded Ocwen from Buy to Hold due to "heightened regulatory risk for the foreseeable future" which will, among other things, "lower the prospects of new MSR acquisitions" and "increase near- to intermediate-term examination/monitor-related costs." In particular, Cyganovich noted that "the regulator's criticism (in substance and tone) of OCN systems and processes failures and its apparent failure

to address the situation over the past year suggests that OCN is not likely to gain approval for pending or future MSR acquisitions anytime soon."

243. Piper Jaffray analyst Michael Grondahl also lowered his price target from $42 to $32 in response to this news. In addition, S&P's credit analyst, Stephen Lynch stated: "We believe the culmination of events and ongoing investigations will limit the company's ability to acquire servicing assets," and downgraded the Company's credit rating from B+ to B. Finally, Sterne Agee analyst Henry Coffey advised investors to "avoid the OCN complex until we can get some clarity around this issue." Coffey further noted that the inaccuracies in Ocwen's initial response to the DFS letter were particularly "disconcerting."

244. In addition, Moody's cited the October 21, 2014 Letter as support for its decision to downgrade Ocwen, stating that the backdating allegations "raise the risk of actions that restrict Ocwen's activities, the levying of monetary fines against Ocwen, or additional actions that negatively affect Ocwen's credit strength."

245. Thereafter, on December 16, 2014, the NMS Monitor issued a report regarding Ocwen's compliance with the NMS. The December 16, 2014 NMS Compliance Report publicly disclosed, for the first time, the inadequacies of Ocwen's REALServicing platform in ensuring the Company's regulatory compliance, and revealed that during Test Period 7, Ocwen's IRG had failed to satisfy the terms of the NMS in several material respects based upon significant deficiencies in its internal control processes.

246. In response to this news concerning the inability of Ocwen's REALServicing platform to comply with its regulatory obligations under the NMS, Ocwen's share price declined by $1.32, or 5.9%, from a closing price of $22.25 on December 15, 2014 to close at $20.93 on December 16, 2014.

247. Finally, before the markets opened on December 22, 2014, Ocwen issued a press release disclosing the terms of the 2014 NYDFS Consent Order, and announcing Defendant Erbey's resignation. The 2014 NYDFS Consent Order, which was attached as an exhibit to a Form 8-K filed by Ocwen on December 22, 2014, revealed, for the first time, the true extent of Ocwen's compliance-related deficiencies. Indeed, Ocwen's compliance deficiencies were so severe that the Company was forced to agree to, among other things, (i) the installation of an NYDFS operations monitor to assess all aspects of Ocwen's operations; (ii) the addition of two independent board members to be determined in consultation with the NYDFS; and (iii) to cease acquiring additional MSRs except when authorized by the NYDFS.

248. In addition, by revealing that, pursuant to the terms of the 2014 NYDFS Consent Order, Defendant Erbey was required to resign as Chairman of Ocwen and the Erbey Companies, the Ocwen's December 22, 2014 disclosures revealed to the market the true extent of Defendant Erbey's wrongful actions throughout the Class Period.

249. Moreover, in the 2014 NYDFS Consent Order, Ocwen and Defendant Faris admitted, for the first time, to the glaring deficiencies within the Company's REALServicing platform, and to the facts contained in the February 26, 2014 Letter, the April 21, 2014 Letter, the August 4, 2014 Letter, and the October 21, 2014 Letter, which contradicted Defendants' public representations to shareholders throughout the Class Period.

250. Ocwen's share price plummeted in response to this news, falling 26.89% from its close of $21.90 on Friday, December 19, 2014, to close at $16.01 on Monday, December 22, 2014. In total, Ocwen shares declined by nearly 63% between February 5, 2014, the day before the first corrective disclosure, and December 22, 2014.

## IX. THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES

251. At all relevant times, the market for Ocwen's common stock was an efficient market for the following reasons, among others:

a) Ocwen's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

b) As a registered and regulated issuer of securities, Ocwen filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c) Ocwen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d) Ocwen was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

e) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Ocwen stock; and

f) Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Ocwen stock between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Ocwen stock was artificially inflated by Defendants' misrepresentations and omissions.

252. As a result of the foregoing, the market for Ocwen common stock promptly digested current information regarding Ocwen from all publicly available sources, and the prices of Ocwen common stock reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Ocwen common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased Ocwen common stock relying upon the integrity of the market price of Ocwen common stock and other market information relating to Ocwen.

253. Under these circumstances, all purchasers of Ocwen common stock during the Class Period suffered similar injuries through their purchases of Ocwen common stock at artificially inflated prices, and a presumption of reliance applies.

## X. THE STATUTORY SAFE HARBOR IS INAPPLICABLE

254. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any such forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

255. Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

## XI. CLASS ACTION ALLEGATIONS

256. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all those who purchased Ocwen common stock during the Class Period. Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

257. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. At the end of the Class Period, approximately 78.3 million shares of Ocwen common stock were outstanding and actively traded on the NYSE. The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Ocwen or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

258. Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

259. Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by, or chargeable to, Defendants. Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

260. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged. Lead Plaintiff knows of no

difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

261. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to members of the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether Defendants' statements issued during the Class Period were materially false and misleading; and

c) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XII. CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Ocwen, Erbey and Faris

262. Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is asserted against Defendants Ocwen, Erbey and Faris (collectively, the "Section 10(b) Defendants").

263. During the Class Period, the Section 10(b) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase Ocwen common stock at artificially inflated prices that did not reflect their true value. In

furtherance of their unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants took the actions set forth herein.

264. While in possession of material adverse, non-public information, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ocwen common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Section 10(b) Defendants are sued as primary participants in the wrongful conduct alleged herein.

265. By virtue of their high-level positions at the Company during the Class Period, Defendants Erbey and Faris were authorized to make public statements, and made public statements during the Class Period on Ocwen's behalf. Defendants Erbey and Faris were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

266. In addition to the duties of full disclosure imposed on the Section 10(b) Defendants as a result of their making of affirmative statements and reports to the investing public, the Section 10(b) Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the

SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Defendants Erbey and Faris also had duties under SOX to ensure that Ocwen's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

267. The Section 10(b) Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them. The Section 10(b) Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Ocwen's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

268. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Ocwen's common stock during the Class Period. In ignorance of the fact that the market prices of Ocwen's common stock were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by the Section 10(b) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by the Section 10(b) Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Ocwen's common stock during the Class

Period at artificially inflated prices. As the truth eventually emerged, the price of Ocwen's common stock substantially declined.

269. At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to the business, operations, performance, and prospects of Ocwen, which was concealed by the Section 10(b) Defendants, Lead Plaintiff and the other members of the Class would not have purchased Ocwen's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

270. By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

271. As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

## For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

272. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against the Individual Defendants.

273. During the Class Period, the Individual Defendants were senior executive officers and/or directors of Ocwen and were privy to confidential and proprietary information concerning Ocwen, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

274. Defendant Erbey served as the Executive Chairman of the Company's Board of Directors at all relevant times. Defendant Faris served as a director and the Company's CEO and President at all relevant times.

275. Because of their high-level positions at Ocwen, the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

276. The Individual Defendants acted as controlling persons of Ocwen within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

277. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the

power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

278. As set forth above, Defendants Erbey, Faris and Ocwen violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of the Individual Defendants' positions as controlling persons, and their participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A. Determining that Counts I and II of this action constitute a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D. Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: October 13, 2015

Respectfully Submitted,

**SALLAH ASTARITA & COX, LLC**
2255 Glades Road
Suite 300E
Boca Raton, Florida 33431
Telephone: (561) 989-9080
Facsimile: (561) 989-9020

By: /s/ Joshua A. Katz
Joshua A. Katz
Florida Bar No. 848301
Email: jak@sallahlaw.com
James D. Sallah
Florida Bar No. 92584
Email: jds@sallahlaw.com
Jeffrey L. Cox
Florida Bar No. 173479
Email: jlc@sallahlaw.com

**KESSLER TOPAZ**
**MELTZER & CHECK LLP**
David Kessler (admitted *pro hac vice*)
dkessler@ktmc.com
Lee Rudy (admitted *pro hac vice*)
lrudy@ktmc.com
Sharan Nirmul (admitted *pro hac vice*)
snirmul@ktmc.com
Richard A. Russo, Jr. (admitted *pro hac vice*)
rrusso@ktmc.com
Meredith L. Lambert (admitted *pro hac vice*)
mlambert@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Lead Counsel for Lead Plaintiff AP7 and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 13, 2015.

/s/ Joshua A. Katz
Joshua A. Katz